

FILED

NOV 04 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

LESLIE FELDMAN; LUZ
MAGALLANES; MERCEDEZ
HYMES; JULIO MORERA; CLEO
OVALLE; PETERSON ZAH, Former
Chairman and First President of the
Navajo Nation; THE DEMOCRATIC
NATIONAL COMMITTEE; DSCC,
AKA Democratic Senatorial Campaign
Committee; THE ARIZONA
DEMOCRATIC PARTY;
KIRKPATRICK FOR U.S. SENATE;
HILLARY FOR AMERICA,

       Plaintiffs-Appellants,

BERNIE 2016, INC.,

       Intervenor-Plaintiff-
       Appellant,

v.

ARIZONA SECRETARY OF STATE'S
OFFICE; MICHELE REAGAN, in her
official capacity as Secretary of State of
Arizona; MARICOPA COUNTY
BOARD OF SUPERVISORS; DENNY
BARNEY; STEVE CHUCRI; ANDY
KUNASEK; CLINT HICKMAN;
STEVE GALLARDO, member of the
Maricopa County Board of Supervisors,
in their official capacities; MARICOPA
COUNTY RECORDER AND
ELECTIONS DEPARTMENT; HELEN

No.   16-16698

D.C. No. 2:16-cv-01065-DLR
District of Arizona,
Phoenix

ORDER

**PURCELL, in her official capacity as Maricopa County Recorder; KAREN OSBORNE, in her official capacity as Maricopa County Elections Director; MARK BRNOVICH, in his official capacity as Arizona Attorney General,**

Defendants-Appellees,

**THE ARIZONA REPUBLICAN PARTY,**

Intervenor-Defendant-Appellee.

**BEFORE:** THOMAS, Chief Judge and O'SCANNLAIN, W. FLETCHER, RAWLINSON, CLIFTON, BYBEE, CALLAHAN, N. R. SMITH, MURGUIA, WATFORD, and OWENS, Circuit Judges.

**THOMAS**, Chief Judge:

We granted, in a prior order, rehearing *en banc* in this appeal. In a separate order, filed concurrently with this opinion, we scheduled *en banc* oral argument for the week of January 17, 2017, in San Francisco, California. The question, then, is whether to grant plaintiffs' motion for an injunction pending appeal. A motions panel denied the motion in the first instance, but we may reconsider that decision as an *en banc* court. For the reasons stated herein, we grant the motion.

The standard for evaluating a stay pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction. *Lopez v.*

2

*Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983); *see also Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006) (order) (discussing injunctions pending appeal). Therefore, we grant the motion for a preliminary injunction pending appeal essentially for the reasons provided in the dissent in *Feldman v. Arizona Sec'y of State*, __ F.3d __, 2016 WL 6427146, at *21–31 (9th Cir. 2016), a copy of which is attached (along with a copy of the majority opinion).

However, there are additional considerations when we consider granting an injunction pending appeal in an election case. When faced with an appeal in cases in which an election is pending, federal courts are "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). And we do not "lightly interfere with . . . a state election." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).

At the outset, it is important to remember that the Supreme Court in *Purcell* did not set forth a *per se* prohibition against enjoining voting laws on the eve of an election. 549 U.S. at 4; *see also Veasey v. Perry*, 135 S. Ct. 9, 10 (2014) (Ginsburg, J., dissenting) ("*Purcell* held only that courts must take careful account

3

of considerations specific to election cases, not that election cases are exempt from traditional stay standards.").  Rather, courts must assess the particular circumstances of each case in light of the concerns expressed by the *Purcell* court to determine whether an injunction is proper.

In this case, the factors that animated the Supreme Court's concern in *Purcell* are not present.  First, the injunction does not affect the state's election processes or machinery.  The injunction pending appeal sought by plaintiffs would not change the electoral process, it simply would enjoin enforcement of a legislative act that would criminalize the collection, by persons other than the voter, of legitimately cast ballots.

H.B. 2023 amended Arizona's election statutes to provide that "A person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony."  Ariz. Rev. Stat. § 16-1005(H).  Enjoining enforcement of H.B. 2023 will not have any effect on voters themselves, on the conduct of election officials at the polls, or on the counting of ballots.  Under H.B. 2023, as the State agrees, legitimate ballots collected by third parties are accepted and counted, and there are no criminal penalties to the voter.  So, under H.B. 2023, if a ballot collector were to bring legitimate ballots to a voting center, the votes would be counted, but the collector would be charged with a felony.  Thus, the only effect

of H.B. 2023, although it is serious, is to make the collection of legitimate ballots by third parties a felony. So, unlike the circumstances involved in *Purcell* or *Southwest Voter*, the injunction at issue here does not involve any change at all to the actual election process. That process will continue unaltered, regardless of the outcome of this litigation. The only effect is on third party ballot collectors, whose efforts to collect legitimate ballots will not be criminalized, pending our review. No one else in the electoral process is affected. And no electoral process is affected.

In contrast, the voter-ID law at issue in *Purcell* changed who was eligible to vote and directly told election officials to turn people away if they lacked the proper proof of citizenship. That circumstance is far different from the case at bar where, as the district court pointed out, the law "does not eliminate or restrict any method of voting, it merely limits who may possess, and therefore return, a voter's early ballot." *Feldman v. Arizona Sec'y of State*, __ F. Supp. 3d __, 2016 WL 5441180 at *9 (D. Ariz. 2016). Thus, in our case, in contrast to *Purcell*, an injunction will not confuse election officials or deter people from going to the polls for fear that they lack the requisite documentation. The election process is unaffected.

Second, none of the cases that caution against federal court involvement in elections involved a statute that newly criminalizes activity associated with voting. This law is unique in that regard.

Third, the concern in *Purcell* and *Southwest Voter* was that a federal court injunction would disrupt long standing state procedures. Here, the injunction preserves the *status quo* prior to the recent legislative action in H.B. 2023. Every other election cycle in Arizona has permitted the collection of legitimate ballots by third parties to election officials. So, the injunction in this case does not involve any disruption to Arizona's long standing election procedures. To the contrary, it restores the *status quo ante* to the disruption created by the Arizona legislature that is affecting this election cycle for the first time.

Fourth, unlike the circumstances in *Purcell* and other cases, plaintiffs did not delay in bringing this action. This action was filed less than six weeks after the passage of the legislation, and plaintiffs have pursued expedited consideration of their claims at every stage of the litigation, both before the district court and ours. Indeed, it was the State that opposed an expedited hearing and briefing schedule at every turn, not the plaintiffs.

Fifth, *Purcell* was decided prior to the Supreme Court's opinion in *Shelby Cty. Ala. v. Holder*, __ U.S. __, 133 S. Ct. 2612 (2013), which declared

6

unconstitutional the Voting Rights Act's coverage formula, and effectively invalidated preclearance requirements under § 5 of the Act. In short, *Purcell* was decided when the preclearance regime under § 5 of the Voting Rights Act was still intact, and Arizona was a covered jurisdiction. The Court in *Purcell* emphasized that the challenged law had already passed the then-effective § 5 preclearance requirements of the United States Department of Justice. As a result, there was a prima facie reason to believe that the challenged statute was not discriminatory, alleviating the concern that the law violated voting rights. *Purcell*, 549 U.S. at 3. That same reassurance is absent here.

Indeed, this case presents precisely the opposite concern. In 2012, Arizona submitted a previous iteration of H.B. 2023 for preclearance. The Department of Justice expressed concern and refused to preclear the bill, S.B. 1412, without more information about its impact on minority voters. Rather than address this concern, Arizona withdrew S.B. 1412 from preclearance and repealed it the following session. Now, unhindered by the obstacle of preclearance, Arizona has again enacted this law—a mere seven months before the general election—with nothing standing in its way except this court. Thus, not only are the preclearance protections considered important in *Purcell* absent in this case, but it is quite

doubtful that the Justice Department would have granted preclearance. In the wake of *Shelby County*, the judiciary provides the only meaningful review of legislation that may violate the Voting Rights Act.[1]

Sixth, unlike the situation in *Purcell*, we have, as a court, given careful and thorough consideration to these issues. *Purcell* involved a barebones order issued by a two judge motion panel, which did not contain a reasoned decision. As the Court described in *Purcell*, "[t]here has been no explanation given by the Court of Appeals showing the ruling and findings of the District Court to be incorrect." 549 U.S. at 5. Here, a three judge merits panel has held oral argument and issued a detailed, reasoned decision and dissent. Our *en banc* court has also considered these issues and reached a decision essentially for the reasons set forth in the dissent. This is not a case in which our court has issued a stay without a detailed consideration and resolution of the issues.

---

[1] Meaningful review of H.B. 2023 is especially important because, as I observed in my dissent, the sponsors of H.B. 2023 could not identify a single example of voter fraud in Arizona caused by ballot collection, nor is there one to be found anywhere in the voluminous record before us. Judge Bybee cites to a 2005 report from the bi-partisan Commission on Federal Election Reform, which recommends that states should reduce the risks of fraud and abuse in absentee voting by prohibiting "third-party" organizations from handling absentee ballots. Dissent at 2. However, the Commission's recommendation was issued before the Supreme Court invalidated the § 5 preclearance requirement; since that time, the voting rights landscape has changed considerably, requiring courts to exercise more vigilance as the primary bulwarks against voter suppression.

In short, the injunction applies to the operation of a statute that would impose felony sanctions on third parties for previously legal action in connection with elections when, as everyone concedes, the statute has no impact on the election process itself. We are preserving the *status quo* for this election, and we will consider the challenge to the new legislation at our *en banc* hearing in the next few months.

**IT IS SO ORDERED**.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LESLIE FELDMAN; LUZ MAGALLANES; MERCEDEZ HYMES; JULIO MORERA; CLEO OVALLE; PETERSON ZAH, Former Chairman and First President of the Navajo Nation; THE DEMOCRATIC NATIONAL COMMITTEE; DSCC, AKA Democratic Senatorial Campaign Committee; THE ARIZONA DEMOCRATIC PARTY; KIRKPATRICK FOR U.S. SENATE; HILLARY FOR AMERICA, *Plaintiffs-Appellants*, <br><br> BERNIE 2016, INC., *Intervenor-Plaintiff-Appellant*, <br><br> v. <br><br> ARIZONA SECRETARY OF STATE'S OFFICE; MICHELE REAGAN, in her official capacity as Secretary of State of Arizona; MARICOPA COUNTY BOARD OF SUPERVISORS; DENNY BARNEY; STEVE CHUCRI; ANDY KUNASEK; CLINT HICKMAN; STEVE GALLARDO, member of the Maricopa County Board of | No. 16-16698 <br><br> D.C. No. 2:16-cv-01065-DLR <br><br><br> OPINION |

Supervisors, in their official capacities; MARICOPA COUNTY RECORDER AND ELECTIONS DEPARTMENT; HELEN PURCELL, in her official capacity as Maricopa County Recorder; KAREN OSBORNE, in her official capacity as Maricopa County Elections Director; MARK BRNOVICH, in his official capacity as Arizona Attorney General,

*Defendants-Appellees*,

THE ARIZONA REPUBLICAN PARTY,
    *Intervenor-Defendant-Appellee.*

Appeal from the United States District Court
for the District of Arizona
Douglas L. Rayes, District Judge, Presiding

Argued and Submitted October 19, 2016
San Francisco, California

Filed October 28, 2016

Before: Sidney R. Thomas, Chief Judge,
and Carlos T. Bea and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Dissent by Chief Judge Thomas

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's order denying plaintiffs' motion for a preliminary injunction seeking to prohibit the enforcement of Arizona House Bill 2023, which precludes individuals who do not fall into one of several exceptions (e.g., election officials, mail carriers, family members, household members, and specified caregivers) from collecting early ballots from another person.

Plaintiffs alleged that Arizona House Bill 2023 violates § 2 of the Voting Rights Act of 1965, the Fourteenth Amendment and the First Amendment because among other things, it disproportionately and adversely impacts minorities, unjustifiably burdens the right to vote, and interferes with the freedom of association.

Addressing the Voting Rights Act claim, the panel held that the district court did not clearly err in concluding that plaintiffs adduced no evidence showing that House Bill 2023 would have an impact on minorities different than the impact on non-minorities, let alone that the impact would result in less opportunity for minorities to participate in the political process as compared to non-minorities. The panel held that because plaintiffs' failed to present such evidence, the district court did not err in declining to consider whether House Bill 2023 interacted with racial discrimination to cause a discriminatory result.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court did not clearly err in (1) finding that House Bill 2023 imposed a minimal burden on voters' Fourteenth Amendment right to vote; (2) finding that Arizona asserted sufficiently weighty interests justifying the limitation; and (3) ultimately concluding that plaintiffs failed to establish that they were likely to succeed on the merits of their Fourteenth Amendment challenge.

The panel held that plaintiffs were unlikely to succeed on the merits of their First Amendment claim. The panel concluded that ballot collection is not expressive conduct implicating the First Amendment, but even if it were, Arizona has an important regulatory interest justifying the minimal burden that House Bill 2023 imposes on freedom of association.

Finally, the panel held that the impact of House Bill 2023 on prospective voters, which the district court found largely to be inconvenience, did not outweigh the hardship on Arizona, which has a compelling interest in the enforcement of its duly enacted laws.

Dissenting, Chief Judge Thomas stated that Arizona has criminalized one of the most popular and effective methods by which minority voters cast their ballots, and that the law violates the Constitution and the Voting Rights Act.

**COUNSEL**

Bruce V. Spiva (argued), Amanda R. Callais, Elisabeth C. Frost, and Marc E. Elias, Perkins Coie LLP, Washington, D.C.; Joshua L. Kaul, Perkins Coie LLP, Madison, Wisconsin; Sarah R. Gonski and Daniel C. Barr, Perkins Coie LLP, Phoenix, Arizona; for Plaintiffs-Appellants.

Malcolm Seymour, Garvey Schubert Baker, New York, New York; D. Andrew Gaona, Andrew S. Gordon, and Roopali H. Desai, Coopersmith Brockelman PLC, Phoenix, Arizona, for Intervenor-Plaintiff-Appellant.

Karen J. Hartman-Tellez (argued) and Kara M. Karlson, Assistant Attorneys General; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Defendants-Appellees.

Sara J. Agne (argued), Colin P. Ahler, and Brett W. Johnson, Snell & Wilmer LLP, Phoenix, Arizona, for Intervenor-Defendants-Appellees.

**OPINION**

IKUTA, Circuit Judge:

In April 2016, Leslie Feldman and other appellants[1] brought an action in district court challenging Arizona House Bill 2023 (H.B. 2023), which precludes individuals who do not fall into one of several exceptions (e.g., election officials, mail carriers, family members, household members, and specified caregivers) from collecting early ballots from another person. *See* 2016 Ariz. Legis. Serv. Ch. 5, § 1 (H.B. 2023) (West) (codified at Ariz. Rev. Stat. § 16-1005(H)–(I)). According to Feldman, this state statute violates § 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, the Fourteenth Amendment, and the First Amendment[2] because, among other things, it disproportionately and adversely impacts minorities, unjustifiably burdens the right to vote, and interferes with the

---

[1] The appellants here (plaintiffs below) are Leslie Feldman, Luz Magallanes, Mercedez Hymes, Julio Morera, and Cleo Ovalle, registered Democratic voters in Maricopa County, Arizona; Peterson Zah, former Chairman and First President of the Navajo Nation and registered voter in Apache County, Arizona; the Democratic National Committee; the DSCC, aka Democratic Senatorial Campaign Committee; the Arizona Democratic Party; a committee supporting the election of Democratic United States Representative Ann Kirkpatrick to U.S. Senate; and Hillary for America, a committee supporting the election of Hillary Clinton as President of the United States. The intervenor-plaintiff/appellant is Bernie 2016, Inc., a committee supporting the election of Bernie Sanders as President of the United States. For convenience, we refer to the appellants as "Feldman."

[2] Because H.B. 2023 is a state law, the challenge technically arises under the Fourteenth Amendment, which applies the First Amendment's protections against States and municipalities. *See City of Ladue v. Gilleo*, 512 U.S. 43, 45 & n.1 (1994).

freedom of association. After the district court denied Feldman's motion for a preliminary injunction, Feldman filed this emergency interlocutory appeal. Because the district court did not abuse its discretion in denying the motion, we affirm.

I

The district court's order denying the motion for a preliminary injunction sets forth the facts in detail, *Feldman v. Ariz. Sec'y of State's Office*, — F. Supp. 3d —, No. CV-16-01065-PHX-DLR, 2016 WL 5341180 (D. Ariz. Sept. 23, 2016), so we provide only a brief summary of the pertinent background facts and procedural history. The district court's factual findings are discussed in detail as they become relevant to our analysis.

A

Arizona law permits "[a]ny qualified elector" to "vote by early ballot." Ariz. Rev. Stat. § 16-541(A).[3] Early voting can occur by mail or in person at an on-site early voting location in the 27 days before an election. *See id.* § 16-542. All Arizona counties operate at least one on-site early voting location. Voters may also return their ballots in person at any polling place without waiting in line, and several counties additionally provide special drop boxes for early ballot submission. Moreover, voters can vote early by mail, either for an individual election or by having their names added to a permanent early voting list. An early ballot is mailed to

---

[3] A "qualified elector" is any person at least eighteen years of age on or before the date of the election "who is properly registered to vote." Ariz. Rev. Stat. § 16-121(A).

every person on that list as a matter of course no later than the first day of the early voting period. *Id.* § 16-544(F). Voters may return their early ballot by mail at no cost, but it must be received by 7:00 p.m. on election day. *Id.* §§ 16-542(C); 16-548(A).

Since 1992, Arizona has prohibited any person other than the elector from having "possession of that elector's unvoted absentee ballot." *See* 1991 Ariz. Legis. Serv. Ch. 310, § 22 (S.B. 1390) (West). In 1997, the Arizona legislature expanded that prohibition to prevent any person other than the elector from having possession of any type of unvoted early ballot. *See* 1997 Ariz. Legis. Serv. Ch. 5, § 18 (S.B. 1003) (West) (codified at Ariz. Rev. Stat. § 16-542(D)). As the Supreme Court of Arizona explained, regulations on the distribution of absentee and early ballots advance Arizona's constitutional interest in secret voting, *see* Ariz. Const. art. VII, § 1, "by setting forth procedural safeguards to prevent undue influence, fraud, ballot tampering, and voter intimidation." *Miller v. Picacho Elementary Sch. Dist. No. 33*, 179 Ariz. 178, 180 (1994) (en banc).

Arizona has long supplemented its protection of the early voting process through the use of penal provisions, as set forth in section 16-1005 of Arizona's statutes. For example, since 1999, it has been a class 5 felony for a person knowingly to mark or to punch an early ballot with the intent to fix an election. *See* 1999 Ariz. Legis. Serv. Ch. 32, § 12 (S.B. 1227) (codified as amended at Ariz. Rev. Stat. § 16-1005(A)). And in 2011, Arizona enacted legislation that made offering to provide any consideration to acquire an early ballot a class 5 felony. *See* 2011 Ariz. Legis. Serv. Ch. 105, § 3 (S.B. 1412) (codified at Ariz. Rev. Stat. § 16-1005(B)). That same legislation regulated the process of

delivering "more than ten early ballots to an election official." *See id.* (formerly codified at Ariz. Rev. Stat. § 16-1005(D)).

In 2016, Arizona again revised section 16-1005 by enacting H.B. 2023 to regulate the collection of early ballots. This law added the following provisions to the existing statute imposing penalties for persons abusing the early voting process:

> H.  A person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony.  An election official, a United States postal service worker or any other person who is allowed by law to transmit United States mail is deemed not to have collected an early ballot if the official, worker or other person is engaged in official duties.

> I.   Subsection H of this section does not apply to:

> 1.  An election held by a special taxing district formed pursuant to title 48 for the purpose of protecting or providing services to agricultural lands or crops and that is authorized to conduct elections pursuant to title 48.

> 2.  A family member, household member or caregiver of the voter.  For the purposes of this paragraph:

(a)  "Caregiver" means a person who provides medical or health care assistance to the voter in a residence, nursing care institution, hospice facility, assisted living center, assisted living facility, assisted living home, residential care institution, adult day health care facility or adult foster care home.

(b)    "Collects" means to gain possession or control of an early ballot.

(c) "Family member" means a person who is related to the voter by blood, marriage, adoption or legal guardianship.

(d)  "Household member" means a person who resides at the same residence as the voter.

Ariz. Rev. Stat. § 16-1005(H)–(I).  Thus, this amendment to section 16-1005 makes it a felony for third parties to collect early ballots from voters unless the collector falls into one of many exceptions. *See id.*  The prohibition does not apply to election officials acting as such, mail carriers acting as such, any family members, any persons who reside at the same residence as the voter, or caregivers, defined as any person who provides medical or health care assistance to voters in a range of adult residences and facilities. *Id.* § 16-1005(I)(2). H.B. 2023 does not provide that ballots collected in violation

of this statute are disqualified or disregarded in the final election tally.

Before H.B. 2023's enactment, third-party early ballot collection was available to prospective voters as an additional and convenient means of submitting a ballot. It was also an important part of the Democratic get-out-the-vote strategy in Arizona. Since at least 2002, the Arizona Democratic Party has collected early ballots from its core constituencies, which it views to include Hispanic, Native American, and African American voters. According to Feldman, H.B. 2023's limitation on third-party ballot collection will require the Democratic Party to retool its get-out-the-vote efforts, for example by increasing voter transportation to polling locations and revising its training scripts to focus on early in-person voting. This, in turn, will require the party to divert resources from projects like candidate promotion to more direct voter outreach to ensure that voters are either casting early ballots in person or mailing their ballots on time.

B

Feldman sued Arizona[4] in April 2016 alleging: (1) a

---

[4] The appellees here (defendants below) are the Arizona Secretary of State's Office; Arizona Secretary of State Michele Reagan in her official capacity; the Maricopa County Board of Supervisors; members of the Maricopa County Board of Supervisors Denny Barney, Steve Chucri, Andy Kunasek, Clint Hickman, and Steve Gallardo in their official capacities; the Maricopa County Recorder and Elections Department; Maricopa County Recorder Helen Purcell and Maricopa County Elections Director Karen Osbourne in their official capacities; and Arizona Attorney General Mark Brnovich in his official capacity. The intervenor-defendant/appellee is the Arizona Republican Party. For convenience, we

violation of § 2 of the Voting Rights Act on account of H.B. 2023's disparate adverse impact on voting opportunities for Hispanics, African Americans, and Native Americans, (2) a denial of equal protection through unjustifiable burdening of the right to vote, (3) a denial of equal protection through disparate treatment, (4) a violation of the First Amendment right to freedom of association, and (5) a violation of the First and Fourteenth Amendments through the "fencing out" of Democratic voters.

In June, Feldman moved for a preliminary injunction prohibiting the enforcement of H.B. 2023. After full briefing, the district court denied the motion on September 23, 2016, on the ground that Feldman was not likely to succeed on the merits of any of her claims and had therefore also not shown a likelihood of irreparable harm. As to the § 2 claim, the district court reviewed the totality of the evidentiary record and found no evidence of a cognizable disparity between minority and non-minority voters. The district court held that Feldman was unlikely to succeed on her Fourteenth Amendment claim because H.B. 2023's burden on voting was minimal and justified by the State's interests in preventing absentee voter fraud and the perception of fraud. As to Feldman's First Amendment claims, the district court held that collecting ballots is not an expressive activity and that even if it were, the State's regulatory interests were sufficient to justify the slight burden that H.B. 2023 imposes. The district court likewise ruled that Feldman was unlikely to succeed on her partisan fencing claim.

refer to the appellees as "Arizona," where appropriate, and otherwise use their individual names.

Feldman filed a timely notice of interlocutory appeal on the same day that the district court entered its order, and a few days later she filed an emergency motion in the district court to stay its order and enjoin the enforcement of H.B. 2023 pending appeal. The district court noted that the standard for obtaining an injunction pending appeal was the same as the standard for obtaining a preliminary injunction and denied the motion because Feldman had not shown that she was likely to succeed on the merits, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), or that "there are serious questions going to the merits" and "the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Feldman filed an emergency motion with this court for an injunction pending appeal and for an expedited appeal. On October 14, a motions panel denied the former request, but granted the latter. The parties were directed to file simultaneous merits briefs by October 17, and the appeal was argued orally on October 19.**[5]**

II

We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1). On an appeal from the denial of a preliminary injunction, we do not review the underlying merits of the claims. *Sw. Voter Registration Educ.*

---

**[5]** In addition to this appeal, Feldman appealed another of the district court's orders denying a separate motion to enjoin preliminarily other election practices challenged in the complaint. That appeal has similarly been expedited and will be the subject of a separate disposition. *See Feldman v. Arizona Sec'y of State's Office*, No. 16-16865, — F.3d — (9th Cir. 2016).

*Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam). Instead, "[o]ur review is limited and deferential," *id.*, and we must affirm the district court's order unless the district court abused its discretion. *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1139 (9th Cir. 2005).

Our abuse-of-discretion analysis proceeds in two steps. *See Gilman v. Schwarzenegger*, 638 F.3d 1101, 1105–06 (9th Cir. 2011) (citing *United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc)). At step one, we ask whether the district court "based its ruling on an erroneous view of the law," *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730 (9th Cir. 1999), reviewing the district court's interpretation of underlying legal principles de novo, *Shelley*, 344 F.3d at 918. We then ask whether the district court's application of the legal standard was illogical, implausible, or otherwise without support in inferences that may be drawn from the facts in the record. *Hinkson*, 585 F.3d at 1262. "We review findings of fact for clear error." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286 (9th Cir. 2013). "[A]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Id.* (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011)).[6]

---

[6] The dissent suggests that the district court's factual findings are entitled to less weight here because "the district court did not conduct any evidentiary hearings to resolve disputed factual issues" and "the parties' submissions were by affidavit." *See* Dissent at 56–57 n.1. Our review of factual findings, however, does not change based on the nature of the evidence. "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a)(6); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. The standard to obtain such relief is accordingly stringent: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. A plaintiff must make a showing as to each of these elements, although in our circuit "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore*, 709 F.3d at 1291. "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

---

("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence and inferences from other facts." (citations omitted)). It is immaterial that the fact-finding occurred here at the preliminary injunction stage; Rule 52(a)(6) by its terms applies to all findings of fact, which necessarily includes the findings of fact that "the court must . . . state" to support denial of an interlocutory injunction, *see* Fed. R. Civ. P. 52(a)(2). *See Anderson*, 470 U.S. at 574 ("Rule 52(a) 'does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous.'" (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982))).

injunction is in the public interest." *All. for the Wild Rockies*, 632 F.3d at 1135.

When faced with a request to interfere with a state's election laws "just weeks before an election," federal courts are "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). These considerations often counsel restraint. In the context of legislative redistricting, for example, the Supreme Court has long cautioned that "where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief . . . even though the existing apportionment scheme was found invalid." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). Similarly, the Supreme Court has declined to order the printing of new ballots at a "late date" even where the existing ballots were held to have unconstitutionally excluded certain candidates. *Williams v. Rhodes*, 393 U.S. 23, 34 (1968). We have also declined on equitable grounds to interfere with the mechanics of fast-approaching elections. *See Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012) (staying a district court's injunction "given the imminent nature of the election"); *Shelley*, 344 F.3d at 919 (declining to enjoin an imminent recall election). And we are not alone in doing so. *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc) ("[T]he district court should fashion an appropriate remedy in accord with its findings; provided, however, that any remedy will not be made effective until after the November 2016 election."); *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014) (staying an injunction "in light of the importance of maintaining the status quo on the eve of an election"); *Colon-*

*Marrero v. Conty-Perez*, 703 F.3d 134, 139 n.9 (1st Cir. 2012) (noting that "even where plaintiff has demonstrated a likelihood of success, issuing an injunction on the eve of an election is an extraordinary remedy with risks of its own"); *Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012) ("As a general rule, last-minute injunctions changing election procedures are strongly disfavored."); *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1012 (6th Cir. 2006) (vacating in part a temporary restraining order that "needlessly creates disorder in electoral processes").

## III

With these principles in mind, we turn to our review of the district court's order denying Feldman's motion for a preliminary injunction against the enforcement of H.B. 2023. On appeal, Feldman argues that the district court erred in concluding that she was unlikely to succeed on her Voting Rights Act, Fourteenth Amendment, and First Amendment claims.[7] We consider each of these arguments in turn.

## A

We first consider Feldman's claim that H.B. 2023 violates § 2 of the Voting Rights Act.

### 1

"Inspired to action by the civil rights movement," Congress enacted the Voting Rights Act of 1965 to improve

---

[7] Feldman does not raise the claim that H.B. 2023 is invalid because it was intended to suppress votes based on partisan affiliation or viewpoint, i.e., a theory of prohibited partisan fencing.

enforcement of the Fifteenth Amendment.[8]  *Shelby County v. Holder*, 133 S. Ct. 2612, 2619 (2013).  Section 5 of the Act prevented states from making certain changes in voting procedures unless those changes obtained "preclearance," meaning they were approved by either the Attorney General or a court of three judges.  *Id.* at 2620.  Section 2 of the Act forbade all states from enacting any "standard, practice, or procedure . . . imposed or applied . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color."  *Id.* at 2619 (quoting Voting Rights Act of 1965, § 2, 79 Stat. 437).

"At the time of the passage of the Voting Rights Act of 1965, § 2, unlike other provisions of the Act, did not provoke significant debate in Congress because it was viewed largely as a restatement of the Fifteenth Amendment."  *Chisom v. Roemer*, 501 U.S. 380, 392 (1991).  In 1980, a plurality of the Supreme Court held that the Fifteenth Amendment, and therefore the Voting Rights Act, were violated only if there was intentional discrimination on account of race.  *City of Mobile v. Bolden*, 446 U.S. 55, 60–62 (1980) (plurality opinion).

In response to *Bolden*, "Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test,'" applied by the Supreme Court in *White v. Regester*, 412 U.S. 755 (1973), and by other

---

[8] The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," and authorizes Congress to enforce the provision "by appropriate legislation."  U.S. Const. amend. XV.

federal courts before *Bolden*. *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986). Opinions decided before *Bolden* had addressed "vote dilution" claims, that is, challenges to practices that diluted a minority group's voting power. *See Shaw v. Reno*, 509 U.S. 630, 641 (1993). In amending § 2, Congress acted to "prohibit legislation that results in the dilution of a minority group's voting strength, regardless of the legislature's intent." *Id.* (emphasis omitted); *see also Gingles*, 478 U.S. at 47–51. Section 2 also applied to "vote denial" claims, meaning challenges to practices that denied citizens the opportunity to vote, such as literacy tests.

As amended in the 1982 amendments, Section 2 of the Voting Rights Act provides:

> §10301. Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation
>
> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political

subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301.

The Supreme Court interpreted this language in *Thornburg v. Gingles*, 478 U.S. 30. *Gingles* explained that to make out a § 2 violation, a plaintiff must show that "under the totality of the circumstances, a challenged election law or procedure had the effect of denying a protected minority an equal chance to participate in the electoral process." *Id.* at 44 n.8. The "totality of the circumstances" includes factors that the Senate derived from cases decided before *Bolden*. *See id.*[9] As summarized by the Court, "[t]he essence of a § 2

---

[9] As explained in *Gingles*, the relevant factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the

claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an

opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

478 U.S. at 36–37 (internal quotation marks omitted). The Supreme Court has stated that another relevant factor is "[a] State's justification for its electoral system." *Houston Lawyers' Ass'n v. Attorney Gen. of Tex.*, 501 U.S. 419, 426–27 (1991).

inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47.

Although many courts have analyzed vote dilution claims, "there is little authority on the proper test to determine whether the right to vote has been denied or abridged on account of race." *Veasey v. Abbott*, 830 F.3d at 244 (emphasis omitted); *see also Ohio Democratic Party v. Husted*, 834 F.3d 620, No. 16-3561, 2016 WL 4437605 (6th Cir. Aug. 23, 2016).[10] Recently, the Fourth, Fifth, and Sixth Circuits (and, in part, the Seventh Circuit) have adopted a two-part framework, based on the text of § 2 and the Supreme Court's guidance in *Gingles*. The test is as follows:

> [1] [T]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of

---

[10] Vote dilution can occur, for instance, where a practice has the effect of reducing or nullifying "minority voters' ability, as a group, to elect the candidate of their choice," *Shaw*, 509 U.S. at 641 (internal quotation marks omitted), and typically involves different arguments and evidence than in vote denial claims. For instance, *Gingles* explained that to prove that use of multimember districts gives minorities less opportunity to elect representatives of their choice in violation of § 2, a plaintiff would generally have to demonstrate: (1) that the minority group at issue is both "sufficiently large and geographically compact to constitute a majority in a single-member district" and "politically cohesive," and (2) that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." 478 U.S. at 50–51 (citations omitted). Such evidence would generally not be applicable to a claim that a specific practice unequally burdens the right to participate in the political process (a vote denial claim).

the electorate to participate in the political process and to elect representatives of their choice, [and]

[2] [T]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014); *Veasey v. Abbott*, 830 F.3d at 244; *Ohio Democratic Party*, 2016 WL 4437605 at \*13–14; *Frank v. Walker*, 768 F.3d 744, 754–55 (7th Cir. 2014) (adopting the test "for the sake of argument").

We agree with this two-part framework, which is consistent with Supreme Court precedent, our own precedent, and with the text of § 2. Under the first prong, a plaintiff must show that the challenged voting practice results in members of a protected minority group having less opportunity than other members of the electorate to participate in the political process. *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (en banc) (citing *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997)). This language "encompasses Section 2's definition of what kinds of burdens deny or abridge the right to vote." *Veasey v. Abbott*, 830 F.3d at 244. Section 2(a) prohibits a state or political subdivision from imposing any "voting qualification or prerequisite to voting" or other "standard, practice, or procedure" in a way that "results in a denial or abridgement" of any U.S. citizen's right to vote on account of race, color, or membership in "a language minority group," 52 U.S.C. § 10303(f), "as provided in subsection (b)." *Id.* § 10301(a). Subsection (b), in turn,

provides that a plaintiff can establish a violation of § 2(a) if "based on the totality of circumstances," the "political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of a protected class "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

In interpreting this first prong, we have held that "a bare statistical showing of disproportionate impact on a racial minority does not satisfy the § 2 'results' inquiry." *Salt River*, 109 F.3d at 595 (emphasis omitted). Rather, "Section 2 plaintiffs must show a causal connection between the challenged voting practice and [a] prohibited discriminatory result." *Id.* As explained by the Sixth Circuit, a "challenged standard or practice causally contributes to the alleged discriminatory impact by affording protected group members less opportunity to participate in the political process." *Ohio Democratic Party*, 2016 WL 4437605, at *13.

The second prong "draws on the Supreme Court's guidance in *Gingles*," *Veasey v. Abbott*, 830 F.3d at 245, which explains the language in § 2(b) requiring a plaintiff to show a violation of the Act "based on the totality of circumstances." 52 U.S.C. § 10301(b). Under this second prong, the plaintiff must show that the challenged practice interacted with racial discrimination "to cause an inequality in the opportunities enjoyed by [minority] and [non-minority] voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47; *see also Gonzalez*, 677 F.3d at 405–06. In *Gonzalez*, we did not have occasion to reach this second step because the plaintiff had adduced no evidence of a causal connection between the challenged photo ID law and a

disproportionate burden on minorities. 677 F.3d at 407. If a plaintiff adduces no evidence that the challenged practice places a burden on protected minorities that causes them to have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," 52 U.S.C. § 10301(b), there is no § 2 violation "whether or not" the challenged practice is "interacting with the history of discrimination" at the second prong of the test, *Gonzalez*, 677 F.3d at 407. However, we agree with our sister circuits that to show a § 2 violation, a plaintiff must establish that the challenged practice imposes a disproportionate burden on minorities compared to non-minorities, and that the challenged law interacts with social and historical conditions that have produced discrimination to cause minorities to have fewer opportunities to participate in the electoral process. *See League of Women Voters of N.C.*, 769 F.3d at 240; *Veasey v. Abbott*, 830 F.3d at 244; *Ohio Democratic Party*, 2016 WL 4437605, at \*13–14.

The district court's legal determinations are reviewed de novo, *Gonzalez*, 677 F.3d at 406, but we defer to "the district court's superior fact-finding capabilities," and review its factual findings for clear error, *Salt River*, 109 F.3d at 591. In analyzing the first prong of a § 2 claim, the district court has the primary responsibility for determining "based 'upon a searching practical evaluation of the past and present reality,'. . . whether the political process is equally open to minority voters." *Id.* (quoting *Gingles*, 478 U.S. at 79). At the second prong of a § 2 claim, the district court must make the "ultimate finding whether, under the totality of the circumstances, the challenged practice violates § 2."

*Gonzalez*, 677 F.3d at 406. This "ultimate finding" is a question of fact that we review for clear error.[11] *Id.*

2

This case raises a vote denial claim, in that Feldman claims that H.B. 2023's restriction on the use of certain third-party ballot collectors denies or abridges minorities' opportunity to vote. As to the first prong of a § 2 claim, Feldman argues that H.B. 2023 caused minority group members to have less opportunity to participate in the political process than non-minorities. Feldman bases this claim on a multi-step argument. First, Feldman points to evidence in the record that minorities are statistically less likely than non-minorities to have access to a vehicle, are more likely to have lower levels of education and English proficiency than non-minorities, are more likely to suffer from health problems than non-minorities, are more likely to have difficult financial situations than non-minorities, and are more likely than non-minorities to rent houses rather than own them, which in turn makes them more likely to move

---

[11] The dissent does not dispute that under *Gonzalez*, the ultimate question is one of fact. Dissent at 56 n.1. Yet, the dissent argues that the district court's assessment of the likelihood of success on the merits of this ultimate question should be reviewed de novo because we are at the preliminary injunction stage, and the question is a mixed question of law and fact. *See id.* at 56–57 n.1. We disagree. Our conclusion that the clear error standard applies in reviewing a trial court's determination at the merits stage is equally applicable at the preliminary injunction stage. *See, e.g.*, *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014) (holding, in an appeal from an order denying a motion for a preliminary injunction, that the clear error standard applies to the district court's determination concerning likelihood of confusion, a mixed question of law and fact, because we had previously held that this standard was applicable to such determinations at the merits stage).

than homeowners. Second, she argues that each of these differences between minorities and non-minorities shows that minorities must rely on ballot collection by third parties more than non-minorities because minorities have less ability to make use of other alternative means of voting (such as voting by mail or in person). According to Feldman, this evidence shows that the burdens of H.B. 2023 fall more heavily on minorities than non-minorities. Feldman further contends that she satisfied the second prong of the § 2 test by introducing substantial evidence supporting eight of the nine Senate Factors.

The district court rejected this argument at the first prong of the § 2 test based on its determination that Feldman failed to show that H.B. 2023 will cause protected minorities to have less electoral opportunities than non-minorities. The district court based its conclusion on both a per se legal rule and on its review of the evidence. First, the district court held that Feldman failed to provide any quantitative or statistical data showing that H.B. 2023's rule precluding the use of certain third-party ballot collectors had a disparate impact on minorities compared to the impact on non-minorities. The district court determined that as a matter of law, such data was necessary in order to establish a § 2 violation. Feldman does not dispute that she did not provide any direct data on the use of third-party ballot collectors,[12] but argues such data

---

[12] Feldman contends that her failure to adduce evidence that ballot collection restrictions place a heavier burden on minorities than non-minorities should be excused because Arizona failed to track how early ballots are returned. As plaintiff, however, Feldman has the obligation of carrying her burden of proof. *See Gingles*, 478 U.S. at 46. Moreover, the record indicates that Feldman had equal ability to generate the required data. Early ballots have been collected in Arizona since at least 2002, and surveys could have determined the racial composition of voters who rely

is not necessary to show a disproportionate burden on minorities, and so the district court's ruling to the contrary was legal error.

While § 2 itself does not require quantitative evidence, past cases suggest that such evidence is typically necessary to establish a disproportionate burden on minorities' opportunity to participate in the political process.[13]  *See, e.g.*, *Veasey v. Abbott*, 830 F.3d at 244 (noting that "courts regularly utilize statistical analyses to discern whether a law has a discriminatory impact"); *Frank*, 768 F.3d at 752; *Gonzalez*, 677 F.3d at 405–07.  Indeed, we are unaware of a vote denial case holding that a challenged practice placed a disproportionate burden on a protected minority leading to "less opportunity than other members of the electorate to participate in the political process and to elect representatives

on others to collect their early ballot in Arizona.  Moreover, the Arizona Democratic Party admits that collecting early votes has been an "integral part of the Arizona Democratic Party's get-out-the-vote strategy" since at least 2002.   Neither the Arizona Democratic Party nor any other organizational plaintiff has explained why it could not have compiled data on the race of the voters utilizing ballot collection given that the organizations collecting ballots appear to be in the best position to gather such information.

[13] The dissent appears to conflate the district court's rule that quantitative data is necessary to establish the first prong of a § 2 violation with a rule that only actual post-election voting data can establish a § 2 violation.  Dissent at 68.  While the Third Circuit has suggested that plaintiffs must prove that a challenged practice has an impact on minority voter turnout, *see Ortiz v. City of Phila. Office of City Comm'rs Voter Registration Div.*, 28 F.3d 306, 314 (3d Cir. 1994), the district court did not do so, and other circuits have evaluated pre-election challenges by considering statistical evidence regarding voting registration, voter turnout in prior elections, *Ohio Democratic Party*, 2016 WL 4437605, at *14, and the possession of qualifying voter ID, *Veasey v. Abbott*, 830 F.3d at 250.

of their choice" under § 2 without such quantitative or statistical data. 52 U.S.C. § 10301(b).**[14]** Notably, Feldman did present statistical evidence in our companion case, discussed *supra* n.5.

We need not resolve this legal issue, however, because despite its ruling regarding the lack of statistical or quantitative evidence, the district court proceeded to review all the evidence in the record and rested its conclusion that Feldman had failed to satisfy the first prong of § 2 on the alternate ground that Feldman did not show that the burden of H.B. 2023 impacted minorities more than non-minorities. Deferring to "the district court's superior fact-finding capabilities," *Salt River*, 109 F.3d at 591, we conclude that this holding is not clearly erroneous.

To satisfy the first prong, Feldman adduced several different categories of evidence, including individual declarations, legislative history, and files from the Department of Justice.

---

**[14]** Feldman relies on two out-of-circuit vote dilution cases to support her argument that statistical evidence is not required in the application of the factors laid out in *Gingles*. *See, e.g.*, *Sanchez v. Colorado*, 97 F.3d 1303, 1320–21 (10th Cir. 1996); *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1126 (3d Cir. 1993). But these cases indicate only that when minority voters claim that racial bloc voting will defeat their opportunity to elect a candidate of their choice, they may rely on a range of evidence to prove that a particular candidate is the preferred minority candidate. *See Sanchez*, 97 F.3d at 1320–21; *Jenkins*, 4 F.3d at 1126. Neither case addresses the evidence required to show that a practice results in protected minorities having less opportunity to participate in the political process than non-minorities. *See League of Women Voters of N.C.*, 769 F.3d at 240; *Veasey v. Abbott*, 830 F.3d at 244. As noted *supra* n.10, different evidence may be required to prove a vote denial claim than to prove a vote dilution claim.

First, the record includes the declarations of Arizona Democratic lawmakers and representatives of organizations that have collected and returned ballots in prior elections. These declarations generally state that members of the communities they have assisted rely on ballot collection services by third parties. The district court discounted this testimony because the declarants did not provide any comparison between the minority communities and non-minority communities. The record supports this finding. The majority of the declarants focused their efforts and obtained their experiences in minority communities.[15] None of these declarants compared the impact of H.B. 2023 on minorities as compared to non-minorities. While two of the declarations made conclusory statements that H.B. 2023 "disproportionately impacts" protected minorities, it is not clear error for the district court to discount such statements, where the declarant did not provide the basis for the conclusion. *Cf. Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (indicating

---

[15] For instance, Declarant Randy Parraz stated that his organization, Citizens for a Better Arizona, "focuse[s] its get-out-the-vote efforts on helping low-income Latino voters." Ian Danley's declaration states that his non-partisan organization, One Arizona, typically engages with voters in neighborhoods that are heavily Latino. Declarants Joseph Larios and Ken Chapman work for the Center for Neighborhood Leadership, which focuses its efforts in "low-income African American and Latino neighborhoods." The Arizona Democratic lawmakers who provided declarations represent constituents who are predominately ethnic minorities. For example, Representative Ruben Gallego "represent[s] approximately 763,000 constituents, nearly 80% of whom are ethnic minorities." State Senator Martin Quezada "represent[s] approximately 213,000 constituents, nearly 80% of which are ethnic minorities." Kate Gallego, the Vice Mayor of the City of Phoenix, represents a district that "is heavily Latino and has the highest percentage—15%—of African Americans in any district in Phoenix."

that a district court should not rely on "unsupported and conclusory statements" when finding facts as part of a preliminary injunction analysis).

Other declarations submitted to the district court stated generally that ballot collection by third parties benefits elderly voters, homebound voters, forgetful voters, undecided voters, and voters from rural areas, but the court found no evidence that these categories of voters were more likely to be minorities than non-minorities. Again, this finding is not clearly erroneous. For instance, the district court stated that while Feldman had provided evidence that the rural communities of Somerton and San Luis were 95.9% and 98.7% Hispanic or Latino and lacked home mail delivery, she did not provide evidence about home mail delivery to non-minorities who reside in the rural communities of Colorado City, Fredonia, Quartzite, St. David, Star Valley, and Wickenburg that are 99.5%, 89.1%, 92.5%, 92.1%, 91.4%, and 90.5% white, respectively. Similarly, while the record shows that the Tohono O'odham Nation lacks home mail delivery service, Feldman does not point to evidence showing that H.B. 2023 has a disproportionate impact on members of the Tohono O'odham Nation compared to non-minorities who also live in rural communities.[16] The district court also rejected Feldman's argument that declarations provided by

---

[16] The dissent emphasizes that the evidence regarding the lack of mail delivery service to the Tohono O'odham Nation and the rural communities of Somerton and San Luis was not contested. Dissent at 72. But the issue is not whether minority voters have limited access to mail delivery service; rather, the issue is whether due to H.B. 2023, minorities "have *less* opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b) (emphasis added). Without evidence regarding non-minorities, the comparison required by § 2 cannot be made.

Sergio Arellano, President of the Tucson Chapter of the Arizona Latino Republican Association, and Kevin Dang, President of the Vietnamese Community of Arizona, admitted that "minority voters disproportionately rely on ballot collection." The district court concluded that these declarations indicated only that minorities are disproportionately vulnerable to being taken advantage of by ballot collectors because they often do not understand English. This conclusion was not clear error.

In addition to the multiple declarations described above, Feldman submitted legislative testimony from the debates on H.B. 2023, showing that a number of lawmakers expressed concerns that H.B. 2023 would impact minority communities, rural communities, working families, and the elderly. This evidence likewise failed to compare minority communities to non-minority communities.

Finally, the district court considered the Department of Justice's files regarding its evaluation of S.B. 1412 (a prior Arizona bill proposing ballot collection restrictions) for purposes of determining whether the bill was entitled to preclearance under § 5 of the Voting Rights Act.[17] The file

---

[17] At the time of S.B. 1412's enactment, Arizona was still subject to Section 5 of the Voting Rights Act, which required Arizona to receive preclearance from the Department of Justice or a federal court convened in the United States District Court for the District of Columbia before implementing a new voting standard, practice, or procedure. 52 U.S.C. § 10304. The Arizona Attorney General submitted S.B. 1412 to the Department of Justice for preclearance. The Department of Justice requested additional information about S.B. 1412's ballot collection restrictions, but did not complete its evaluation of S.B. 1412 because the Arizona legislature repealed the ballot-collection measure as a part of an omnibus bill in 2012.

contained summaries of telephone conversations between a Department of Justice attorney and various individuals about ballot collection practices in Arizona.  None of these summaries provide a comparison of the effect of S.B. 1412 on minorities and non-minorities.  Feldman claims that a summary of a phone call with then-Arizona Elections Director Amy Bjelland shows that Arizona legislators targeted S.B. 1412 at Hispanic communities.  The district court, however, reasonably interpreted this phone summary as stating that the impetus for S.B. 1412 was an accusation of voter fraud in San Luis, a predominately Hispanic area in the southern portion of Arizona, that S.B. 1412 was aimed at this sort of fraud, and that in Bjelland's view, voter fraud was more prevalent at the border because individuals living closer to the border are more impacted by corruption and voting fraud claimed to exist in Mexico.

On appeal, Feldman argues that the district court erred because it did not accept her multi-step argument that she met the first prong of § 2 based on evidence that certain socioeconomic circumstances disparately impact minorities, and this disparate impact would combine with a lack of certain third-party ballot collectors to lessen minorities' opportunities in the political process.  We reject this argument.  Feldman's evidence of differences in the socioeconomic situation of minorities and non-minorities does not satisfy the first prong of the § 2 test because it does not show that H.B. 2023 causes a protected minority group to have less opportunity than other members of the electorate to participate in the political process. *See Gingles*, 478 U.S. at 44 n.8.  Proof of a causal connection between the challenged voting practice and a prohibited result is "crucial," *Gonzalez*, 677 F.3d at 405 (citing *Salt River*, 109 F.3d at 595), and Feldman points to no evidence that the restriction on third-

party ballot collection causes minorities to have less opportunity to vote than non-minorities. Indeed, although H.B. 2023 was in effect for all but the first three days of early voting for the Primary Election, the record does not include any testimony by minority voters that their ability to participate in the political process was affected by the inability to use a third-party ballot collector. The district court did not clearly err in declining to make the inference urged by Feldman (i.e., that due to minorities' socioeconomic status, they were likely to have fewer opportunities than non-minorities to participate in the political process if they could not use certain third-party ballot collectors) in the absence of evidence supporting that inference.

We rejected a similar argument in *Gonzalez*. As in this case, the plaintiff in *Gonzalez* argued that a law requiring prospective voters to obtain a photo identification before they cast ballots at the polls violated § 2 because it had a statistically significant disparate impact on Latino voters. 677 F.3d at 406. To support this argument, the plaintiff presented evidence "of Arizona's general history of discrimination against Latinos and the existence of racially polarized voting." *Id.* at 407. Despite this general history of discrimination, we affirmed the district court's rejection of this claim, because the plaintiff was unable to produce evidence that the photo identification law caused minorities to have less opportunity to participate in the political process. *Id.; see also Frank*, 768 F.3d at 752–55 (holding that a photo identification law which had a disparate impact on minorities did not violate § 2 because plaintiffs failed to show that the law had caused a discriminatory result). For the same reason, Feldman's evidence regarding the socioeconomic situation of minorities is insufficient in the absence of evidence that

H.B. 2023 caused minorities to have less opportunity to participate in the political process.

In short, the district court did not clearly err in concluding that Feldman adduced no evidence showing that H.B. 2023 would have an impact on minorities different than the impact on non-minorities, let alone that the impact would result in less opportunity for minorities to participate in the political process as compared to non-minorities.[18]  Because the court found that Feldman's § 2 claim failed at the first prong, as in *Gonzalez*, the district court had no obligation to reach the second prong, and therefore did not err in declining to consider whether H.B. 2023 interacted with racial discrimination to cause a discriminatory result. *See* 677 F.3d at 407.[19]  The district court's conclusion that H.B. 2023 did not violate § 2 was not "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record," *Hinkson*, 585 F.3d at 1262 (internal

---

[18] The dissent argues that once plaintiffs have established a burden on minority voters, a "burden of rejoinder" should be placed on the state. Dissent at 72–73. But § 2 requires more than merely showing a burden on minorities.  It requires plaintiffs to establish that minorities "have less opportunity than other members of the electorate to participate in the political process." 52 U.S.C. § 10301.  We have held that it is not enough for the plaintiff to make "a bare statistical showing of disproportionate *impact* on a racial minority"; rather, "Section 2 *plaintiffs* must show a causal connection between the challenged voting practice and [a] prohibited discriminatory result." *Salt River*, 109 F.3d at 595 (second emphasis added) (quoting *Ortiz*, 28 F.3d at 312); *see also Fairley v. Hattiesburg*, 584 F.3d 660, 669 (5th Cir. 2009) ("[T]he plaintiffs bear the burden of proof in a VRA case, and any lack of record evidence on VRA violations is attributed to them.").

[19] We likewise do not consider the nine factors set forth in *Gingles*, 478 U.S. at 36–37.

quotation marks omitted).  Therefore, we hold that the district court did not abuse its discretion in finding Feldman was unlikely to succeed on her Voting Rights Act claim.

## B

Feldman also contends that the district court erred in concluding that her facial challenge to H.B. 2023 on constitutional grounds was unlikely to succeed on the merits. We first lay out the analytical framework for facial challenges to voting laws under the Fourteenth and First Amendments, and then consider Feldman's challenges.[20]

## 1

The Constitution grants the States a "broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives.'"  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (quoting U.S. Const., art. 1, § 4, cl. 1).  This power under the Elections Clause to regulate elections for federal offices "is matched by state control over the election process for state offices." *Id.* (quoting *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)).  "Governments necessarily 'must play an active role in structuring elections,'" *Pub. Integrity All., Inc. v. City of Tucson*, — F.3d —, No. 15-16142, 2016 WL 4578366, at *3 (9th Cir. Sept. 2, 2016) (en banc) (quoting *Burdick v.*

---

[20] The dissent contends that "neither the plaintiffs nor the defendants categorize the challenge to H.B. 2023 as a facial challenge."  Dissent at 63 n.3.  However, "[t]he label is not what matters." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).  Because Feldman's "claim and the relief that would follow—an injunction" barring Arizona from implementing and enforcing H.B. 2023—"reach beyond the particular circumstances of these plaintiffs," *id.*, it is properly characterized as a facial challenge.

*Takushi*, 504 U.S. 428, 433 (1992)), and "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes," *Storer v. Brown*, 415 U.S. 724, 730 (1974).

However, when a state exercises its power and discharges its obligation "[t]o achieve these necessary objectives," the resulting laws "inevitably affect[]—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). Therefore, the state's "power is not absolute, but is 'subject to the limitation that [it] may not be exercised in a way that violates . . . specific provisions of the Constitution.'" *Wash. State Grange*, 552 U.S. at 451 (alterations in original) (quoting *Williams*, 393 U.S. at 29). While the Constitution does not expressly guarantee the right to vote in state and federal elections, the Fourteenth Amendment protects a citizen's right "to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). That is, "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966). Similarly, "[w]hile the freedom of association is not explicitly set out in the [First] Amendment," *Healy v. James*, 408 U.S. 169, 181 (1972), "the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment . . . as an indispensable means of preserving other individual liberties," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). This right includes the ability "to associate . . . for the advancement of common political goals and ideas," *Timmons*

*v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997), and "the ability of citizens to band together in promoting among the electorate candidates who espouse their political views," *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). The Supreme Court has long recognized that "some forms of 'symbolic speech' [are] deserving of First Amendment protection." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65 (2006). However, First Amendment protection extends "only to conduct that is inherently expressive." *Id.* at 66. Conduct is inherently expressive if it "is intended to be communicative and . . . in context, would reasonably be understood by the viewer to be communicative." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984). For instance, burning the American flag, *Texas v. Johnson*, 491 U.S. 397, 406 (1989), and wearing an unauthorized military medal, *United States v. Swisher*, 811 F.3d 299, 314 (9th Cir. 2016) (en banc), are expressive conduct within the scope of the First Amendment.

The Supreme Court has explained that constitutional challenges to election laws "cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789. Rather, "a more flexible standard applies." *Burdick*, 504 U.S. at 434. "A court considering a challenge to a state election law must weigh [1] 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against [2] 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration [3] 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* (quoting *Anderson*, 460 U.S. at 789). This framework is generally referred to as the *Anderson*/*Burdick* balancing test. In

applying this test, we: (1) identify and determine the magnitude of the burden imposed on voters by the election law; (2) identify the State's justifications for the law; and (3) weigh the burden against the State's justifications. The severity of the burden that an election law imposes "is a factual question on which the plaintiff bears the burden of proof." *Democratic Party of Haw. v. Nago*, 833 F.3d 1119, 1122–24 (9th Cir. 2016) (citing *Cal. Democratic Party*, 530 U.S. 567); *Gonzalez v. Arizona*, 485 F.3d 1041, 1050 (9th Cir. 2007) (noting that whether an election law imposes a severe burden is an "intensely factual inquiry").

"[T]he severity of the burden the election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the court." *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 729 (9th Cir. 2015) (quoting *Nader v. Cronin*, 620 F.3d 1214, 1217 (9th Cir. 2010) (per curiam)). "This is a sliding scale test": when the burden imposed is severe, not only the "more compelling the state's interest must be," *Ariz. Green Party v. Reagan*, — F.3d —, No. 14-15976, 2016 WL 5335037, at *4 (9th Cir. Sept. 23, 2016), but the regulation also "must be 'narrowly drawn to advance a state interest of compelling importance,'" *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

By contrast, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788) ; *see also Ariz. Green Party*, 2016 WL 5335037, at *4 ("[A] state may justify election regulations imposing a lesser burden by demonstrating the state has important regulatory interests." (quoting *Ariz. Libertarian Party*, 798 F.3d at

729–30)).   While *Burdick* does not call for rational basis review, *Pub. Integrity All.*, 2016 WL 4578366, at \*4, it likewise specifically declined to require that all voting regulations be narrowly tailored and subjected to strict scrutiny, *see Burdick*, 504 U.S. at 433.   Rather, *Burdick* held that when a statute imposes only a limited burden, the "'precise interests' advanced by the State" alone may be "sufficient to defeat [a plaintiff's] facial challenge," *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203 (2008) (controlling opinion of Stevens, J.) (quoting *Burdick*, 504 U.S. at 434).   *See also Pub. Integrity All.*, 2016 WL 4578366, at \*6 (upholding a municipal election law, even though it was aimed at furthering the same interests as other municipal ordinances, because it might have marginal impact beyond that provided by other laws).

Finally, the Supreme Court has warned that facial challenges "are best when infrequent," *Sabri v. United States*, 541 U.S. 600, 608 (2004), and "are disfavored for several reasons" in the election law context in particular, *Wash. State Grange*, 552 U.S. at 450.   For instance, Arizona "has had no opportunity to implement [H.B. 2023], and its courts have had no occasion to construe the law in the context of actual disputes arising from the electoral context, or to accord the law a limiting construction to avoid constitutional questions." *Id.*   "Claims of facial invalidity often rest on speculation," and "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'"   *Id.* (quoting *Sabri*, 541 U.S. at 609).   When faced with underdeveloped "evidence regarding the practical consequences of [H.B. 2023], we find ourselves in the position of Lady Justice: blindfolded and stuck holding empty scales." *Ariz. Green Party*, 2016 WL 5335037, at \*6 (quoting *Ariz. Libertarian Party*, 798 F.3d at 736 (McKeown, J.,

concurring)).    Accordingly, plaintiffs asserting a facial challenge "bear a heavy burden of persuasion," the magnitude of which the Supreme Court has reminded us "to give appropriate weight." *Crawford*, 553 U.S. at 200.

2

We now turn to Feldman's Fourteenth Amendment claim. Feldman claims that the district court made a number of errors in determining that she was unlikely to prevail on the merits of her claim that H.B. 2023 imposes an undue burden on Arizona voters that is not outweighed by the State's asserted interests.

Feldman first argues that the district court erred in its application of the *Anderson/Burdick* framework.  Under this framework, a district court must first consider the burden posed by H.B. 2023.  *Burdick*, 504 U.S. at 434.    In considering this burden, we must take care to avoid the "sheer speculation" that often accompanies the assessment of burdens when considering facial challenges. *Wash. State Grange*, 552 U.S. at 454; *see also Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 866 (9th Cir. 2008) ("In any event, a speculative, hypothetical possibility does not provide an adequate basis to sustain a facial challenge.").

Here, the district court did not clearly err in finding that H.B. 2023 did not "significantly increase the usual burdens of voting."  As an initial matter, H.B. 2023 on its face imposes less of a burden than the challenged law did in *Crawford*. *Crawford* considered the impact of Indiana's voter-ID law, which required voters who lacked photo ID to sustain "the inconvenience of making a trip to the [state Bureau of Motor Vehicles], gathering the required documents, and posing for

a photograph" to obtain the requisite identification. 553 U.S. at 198. In the alternative, a voter who could not or did not want to obtain a photo ID could submit a provisional ballot and "travel to the circuit court clerk's office within 10 days to execute the required affidavit" accompanying the provisional ballot. *Id.* at 199. The Court found that the law imposed "only a limited burden on voters' rights." *Id.* at 203 (quoting *Burdick*, 504 U.S. at 439); *see id.* at 209 (Scalia, J., concurring in the judgment).

*Crawford*'s finding of a limited burden compels a similar conclusion here. While the Indiana photo ID law imposed an affirmative requirement that voters possess photo ID in order to vote, H.B. 2023 limited only one of several methods of voting that Arizona law otherwise makes available: only third-party ballot collectors who do not qualify under the statute are precluded from delivering ballots. The district court's conclusion that the limitation of one alternative for ballot collection does not "represent a significant increase over the usual burdens of voting" is not clearly erroneous. *Crawford*, 553 U.S. at 198; *see Ohio Democratic Party*, 2016 WL 4437605, at \*6 (rejecting a challenge to Ohio's "withdrawal of the convenience of same-day registration" and holding that the Constitution does not "require all states to maximize voting convenience").[21]

---

[21] The dissent argues that because "80% of the electorate uses early absentee voting," it "has transcended convenience and has become instead a practical necessity." Dissent at 62. In doing so, the dissent elides the distinction between early absentee voting in general and early absentee voting through third-party ballot collection, the only practice restricted by H.B. 2023. Feldman did not provide "concrete evidence," *Crawford*, 553 U.S. at 201, of the number of voters who rely on this practice.

Further, any burden imposed by H.B. 2023 is mitigated by the availability of alternative means of voting. The lead opinion in *Crawford* held that the burden imposed by Indiana's voter-ID law was "mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots," even though doing so required a voter to make two trips: the first to vote and the second to execute the required affidavit. 553 U.S. at 199. Here, H.B. 2023 could at most require that a voter make that first trip—to vote in the first instance. Because making two trips does not represent a burden "over the usual burdens of voting" in *Crawford*, *id.* at 198, the district court could reasonably determine that the single trip required here does not represent such a burden, either. Although Feldman contends that "thousands" of Arizona voters rely on third-party ballot collection in order to cast their early ballots," the record does not support her additional claim that without ballot collection by third parties disqualified by H.B. 2023, many Arizona voters "would not have been able to vote in prior elections."

Feldman also argues that the district court erred in failing to consider the burdens imposed on specific groups of voters for whom H.B. 2023 poses a more serious challenge. We disagree, because the evidence in the record was insufficient for such an analysis. While a court may consider a law's impact on subgroups, there must be sufficient evidence to enable a court "to quantify the burden imposed on the subgroup." *Pub. Integrity All.*, 2016 WL 4578366, at *3 n.2 (citing *Crawford*, 553 U.S. at 199–203; *id.* at 212–17 (Souter, J., dissenting)); *see also Ne. Ohio Coal. for the Homeless v. Husted*, — F.3d —, Nos. 16-3603, 16-3691, 2016 WL 4761326, at *11–12 (6th Cir. Sept. 13, 2016) (holding that *Crawford* may permit "weighing the 'special burden' faced by 'a small number of voters'" when there is "quantifiable

evidence from which an arbiter could gauge the frequency with which this narrow class of voters has been or will become disenfranchised," but that in the absence of such evidence, a court should "consider the burden that the provisions place on all . . . voters." (quoting *Crawford*, 553 U.S. at 200)), *reh'g en banc denied*, — F.3d —, 2016 WL 5939925 (6th Cir. Oct. 6, 2016). In *Crawford*, the Court acknowledged that the photo ID requirement placed "a somewhat heavier burden . . . on a limited number of persons," but did not consider this burden because it was "not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified." 553 U.S. at 199–200. Accordingly, the Court instead considered "the statute's broad application to all . . . voters." *Id*. at 202–03 (quoting *Burdick*, 504 U.S. at 439). Here, the record includes broad assertions regarding the number of ballots previously collected, but does not include sufficient "concrete evidence" of "the number of registered voters" within specific groups or evidence that permits weighing of the burden on these voters, such as whether H.B. 2023 would merely inconvenience these voters or preclude them from voting. *Id.* at 200–01. Given the paucity of evidence regarding these key issues, the district court did not err in declining to focus on the burden on specific groups. *See id.* at 201–02. We conclude that the district court did not clearly err in identifying and assessing the burden imposed by H.B. 2023.

Because the district court did not clearly err in its determination of the burden imposed by H.B. 2023 on the right to vote, we proceed to the second step of the *Anderson*/*Burdick* framework and consider Arizona's interests. Feldman does not dispute that Arizona's interest in preventing absentee-voting fraud and maintaining public

confidence in elections are "relevant and legitimate state interests," *Crawford*, 553 U.S. at 191, nor could she.  "A State indisputably has a compelling interest in preserving the integrity of its election process."  *Purcell*, 549 U.S. at 4 (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)).  "While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Crawford*, 553 U.S. at 196.  Similarly, "public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Id.* at 197.  And as the district court correctly recognized, absentee voting may be particularly susceptible to fraud, or at least perceptions of it.  *See Crawford*, 553 U.S. at 225 (Souter, J., dissenting); *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004); *see also United States v. Townsley*, 843 F.2d 1070 (8th Cir. 1988).  The district court did not err in crediting Arizona's important interest in preventing fraud even in the absence of evidence that voter fraud had been a significant problem in the past.  In *Crawford*, the Court noted that "[t]he record contains no evidence of any such fraud actually occurring," but nonetheless concluded that "not only is the risk of voter fraud real but . . .  it could affect the outcome of a close election."  553 U.S. at 194–96; *see also Ohio Democratic Party*, 2016 WL 4437605, at *9; *Frank*, 768 F.3d at 749–50.  Courts recognize that legislatures need not restrict themselves to a reactive role: legislatures are "permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively."  *Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986).

Feldman also contends that the district court made several legal errors in assessing Arizona's interests and in weighing them against the burden on voters.  First, Feldman argues that

the district court erred in holding that "laws that do not significantly increase the usual burdens of voting do not raise substantial constitutional concerns." We disagree. It is axiomatic that under a balancing test such as *Anderson/Burdick*'s, less weight on one side of the scale allows that scale to be more easily tipped in the other direction. "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).

Second, Feldman argues that the district court failed to consider the means-end fit between Arizona's interests in preventing absentee-voting fraud and eliminating the perception of fraud on the one hand and the burdens imposed on voters on the other hand. Relying on a vacated Sixth Circuit opinion, *see Ohio State Conference of the NAACP v. Husted*, 768 F.3d 524 (6th Cir. 2014), *vacated*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014), Feldman argues that Arizona was required to "explain why the particular restriction imposed is actually necessary," *id.* at 545. Again, we disagree. The lead opinion in *Crawford* held that a limited burden on voters' rights imposed by the challenged law was outweighed by two "unquestionably relevant" interests offered by the state, without considering the fit between those interests and the voter-ID law. *See* 553 U.S. at 203. And as several of our sister circuits have recognized, it is "practically self-evidently true" that implementing a measure designed to prevent voter fraud would instill public confidence. *Ohio Democratic Party*, 2016 WL 4437605, at *9 (citing *Crawford*, 553 U.S. at 197); *see Frank*, 768 F.3d at 750 (noting that *Crawford* took "as almost self-evidently

true" the relationship between a measure taken to prevent voter fraud and promoting voter confidence). By asserting its interest in preventing election fraud and promoting public confidence in elections, essentially the same interests as in *Crawford*, Arizona bore its burden of establishing "important regulatory interests" sufficient to justify the minimal burden imposed by H.B. 2023. Accordingly, the district court could reasonably conclude that Arizona's means—restricting third-party ballot collection—matched the desired ends of preventing voter fraud and promoting voter confidence in the electoral system.[22]

For similar reasons, we reject Feldman's argument that the district court erred in not considering whether Arizona's "goals could have been achieved through less burdensome means." Neither the Supreme Court nor we have required a state to prove there is no less restrictive alternative when the burden imposed is minimal. *Burdick* expressly declined to require that restrictions imposing minimal burdens on voters' rights be narrowly tailored. *See* 504 U.S. at 433. Consistent with *Burdick*, we upheld in *Public Integrity Alliance* an

---

[22] The dissent argues that "the state's justification for the law was weak" because it "could not identify a single example of voter fraud caused by ballot collection." Dissent at 62. But the record does contain evidence of improprieties, such as ballot collectors impersonating elections officials. Moreover, Arizona's interest is not simply in preventing fraud, but also in promoting public confidence in the electoral system, and the record contains evidence from which the district court could properly conclude, as Feldman's expert conceded, that absentee voting is particularly conducive to fraud. "[O]ccasional examples" of fraud—as documented in the Arizona Republic article cited by the dissent—"demonstrate that . . . the risk of voter fraud [is] real," *Crawford*, 553 U.S. at 195–96. Courts, wisely, do not require "that a State's political system sustain some level of damage" before allowing "the legislature [to] take corrective action." *Munro*, 479 U.S. at 195.

election restriction (ward-based primary elections) that furthered the interest of "ensuring local representation by and geographic diversity among elected officials" by ensuring that "the candidates nominated in a given ward actually have the support of a majority of their party's voters in that ward," even though other less-restrictive means such as candidate-residency requirements could achieve the same broader purpose. 2016 WL 4578366, at *5. Similarly, in *Arizona Green Party*, we rejected the argument that the state must "adopt a system that is the most efficient possible" such that later deadlines could be set, in light of the "de minimis burden" imposed by the existing deadlines. 2016 WL 5335037, at *7. As the district court found, H.B. 2023 establishes a chain-of-custody for absentee ballots that furthers Arizona's stated interests of reducing fraud and promoting public confidence, even though other, less restrictive, laws may achieve the same broader purpose.

In sum, we conclude that the district court did not clearly err in finding that H.B. 2023 imposed a minimal burden on voters' Fourteenth Amendment right to vote, in finding that Arizona asserted sufficiently weighty interests justifying the limitation, and in ultimately concluding that Feldman failed to establish that she was likely to succeed on the merits of her Fourteenth Amendment challenge.

3

We next consider Feldman's First Amendment claim. According to Feldman, the district court undervalued the expressive significance of ballot collection when it concluded that she was unlikely to succeed on the merits of her First Amendment freedom of association claim. Feldman contends that through ballot collection, individuals and organizations

convey their support for the democratic process and for particular candidates and political parties. For example, declarant Ian Danley stated that his coalition, One Arizona, helps its "voters ensure that their voices are heard on Election Day" by "collecting and personally delivering their signed, sealed early ballots." Similarly, declarant Rebekah Friend stated that under H.B. 2023, the Arizona State Federation of Labor will have difficulty fulfilling its goal of encouraging its members to register and vote because it "will no longer be able to help its members or other voters vote by taking their signed, sealed early ballots to the Recorder's office." Therefore, Feldman argues, "ballot collectors convey that voting is important *not only with their words but with their deeds*."

We first consider whether ballot collection is expressive conduct protected under the First Amendment. *See Clark*, 468 U.S. at 293 n.5 ("[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive."). We agree with the district court that it is not. Even if ballot collectors intend to communicate that voting is important, "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Unlike burning an American flag or wearing a military medal, ballot collection does not convey a message that "would reasonably be understood by the viewer to be communicative." *Swisher*, 811 F.3d at 311 (quoting *Clark*, 468 U.S. at 294). Rather, a viewer would reasonably understand ballot collection to be a means of facilitating voting, not a means of communicating a message.

*See, e.g.*, *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (concluding that collecting and delivering voter registration applications is "merely conduct" because "there is nothing inherently expressive" about it).

While political organizations undoubtedly engage in protected activities, ballot collection does not acquire First Amendment protection merely because it is carried out along with protected activities and speech. *See Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. at 66 (concluding that "combining speech and conduct" is not enough to create expressive conduct); *Voting for Am.*, 732 F.3d at 389 ("The Court also has repeatedly explained that non-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech."). Because H.B. 2023 regulates only third-party ballot collection, which is non-expressive conduct, the district court did not err in concluding that H.B. 2023 does not implicate the First Amendment.

Moreover, even if we assumed that H.B. 2023 implicates the First Amendment, we agree with the district court's conclusion that Arizona's regulatory interests in preventing voter fraud justifies the minimal burden that H.B. 2023 imposes on associational rights under the *Anderson*/*Burdick* test. Looking first at the burden imposed by H.B. 2023, the district court did not clearly err in finding that H.B. 2023 does not impose a severe burden. H.B. 2023 does not prevent individuals and organizations from encouraging others to vote, educating voters, helping voters register, helping voters complete their early ballots, providing transportation to voting sites or mailboxes, or promoting political candidates and parties. Ariz. Rev. Stat. § 16-1005; *see, e.g.*, *Timmons*, 520 U.S. at 361 (concluding that the burden a Minnesota law

imposed on a political party's First and Fourteenth Amendment rights was not severe because the party remained "free to endorse whom it likes, to ally itself with others, to nominate candidates for office, and to spread its message to all who will listen"). H.B. 2023 does not prevent individuals and organizations from associating "for the advancement of common political goals and ideas," *Timmons*, 520 U.S. at 357, or from "[banding] together in promoting among the electorate candidates who espouse their political views," *Cal. Democratic Party*, 530 U.S. at 574.

Turning to Arizona's regulatory interests, we conclude for the reasons discussed *supra* at 44–45 that the district court did not clearly err in finding that Arizona has important regulatory interests in preventing voter fraud and maintaining the integrity of the electoral process. Accordingly, the district court could properly conclude that Arizona's important regulatory interests are sufficient to justify any minimal burden on associational rights, as discussed *supra* at 46–47.

In sum, we conclude that ballot collection is not expressive conduct implicating the First Amendment, but even if it were, Arizona has an important regulatory interest justifying the minimal burden that H.B. 2023 imposes on freedom of association. The district court did not err in concluding that the Feldman was unlikely to succeed on the merits of her First Amendment claim.

IV

Having concluded that the district court did not err in holding that Feldman failed to demonstrate a likelihood of success on the merits, we briefly consider the remaining equitable factors for issuing a preliminary injunction.

Because it is not likely that Feldman will suffer a violation of her statutory or constitutional rights, she likely has "failed to establish that irreparable harm will flow from a failure to preliminarily enjoin defendants' actions." *Hale v. Dep't of Energy*, 806 F.2d 910, 918 (9th Cir. 1986).

Even if Feldman had raised serious questions as to the merits of her claims, and also shown a likelihood of irreparable harm, *Winter*, 555 U.S. at 22, relief would not be warranted because Feldman has not shown that "the balance of hardships tips sharply" in her favor or that an injunction is in the public interest. *All. for the Wild Rockies*, 632 F.3d at 1135. This case is not one in which "qualified voters might be turned away from the polls." *Purcell*, 549 U.S. at 4. Rather, it is one in which voters are precluded from giving their ballots to third-party ballot collectors and organizations must use an alternative means of mobilizing their voters. *Cf. Lair*, 697 F.3d at 1215 (the existence of "other options for engaging in political speech" militated in favor of staying an injunction against enforcement of a state law restricting one avenue of speech). Indeed, the district court found from the evidence that many voters who entrust their ballots to collectors do so merely for convenience, and we cannot disturb this finding. *See Hinkson*, 585 F.3d at 1262 (noting our deference to findings that are plausible and supported by the record). The record does not establish that the organizational plaintiffs' need, in light of H.B. 2023, to reallocate resources as part of a reconfigured get-out-the-vote effort constitutes a substantial hardship.

The impact of H.B. 2023 on prospective voters, which the district court found largely to be inconvenience, does not outweigh the hardship on Arizona, which has a compelling interest in the enforcement of its duly enacted laws. *See Nken*

*v. Holder*, 556 U.S. 418, 436 (2009) (recognizing the public interest in the enforcement of the law); *Veasey v. Perry*, 769 F.3d at 895 ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."). As a general matter, Arizona's regulation of the early voting process advances its interest in preserving ballot secrecy and preventing "undue influence, fraud, ballot tampering, and voter intimidation." *Miller*, 179 Ariz. at 180. The interest in preventing fraud is "compelling," *Purcell*, 549 U.S. at 4, and for Arizona no less than for Feldman, there are no "do over" elections; "the State cannot run the election over again" with the tools H.B. 2023 provides to combat possible fraud. *Veasey v. Perry*, 769 F.3d at 896. On this record, then, the balance cannot be said to tip "sharply" in Feldman's favor. *All. for the Wild Rockies*, 632 F.3d at 1135.

We turn finally to the public interest, an inquiry that "primarily addresses impact on non-parties," *Bernhardt v. Los Angeles County*, 339 F.3d 920, 931 (9th Cir. 2003), but that closely tracks Arizona's own interests, *see Nken*, 556 U.S. at 435. Like Arizona itself, its citizens "have a deep interest in fair elections." *Lair*, 697 F.3d at 1215. Even in the absence of actual fraud, the prospect of early voting fraud may undermine public confidence in the results of the election. *Purcell*, 549 U.S. at 4. At the very least, H.B. 2023 assists in exorcizing the specter of illegitimacy that may hang over the electoral process in the minds of some citizens. "Given the deep public interest in honest and fair elections" as well as the "numerous available options" for voters to submit ballots in Arizona consistent with H.B. 2023, *Lair*, 697 F.3d at 1215, removing H.B. 2023 from the State's regulatory toolbox in the middle of the voting period may

well do more harm to the perceived integrity and legitimacy of the election than good.

Feldman is therefore not only unlikely to prevail on the merits, but, as the district court concluded, her interest in avoiding possible irreparable harm does not outweigh Arizona's and the public's mutual interests in the enforcement of H.B. 2023 pending final resolution of this case. In reaching this conclusion, we heed the Supreme Court's admonition to consider the harms "specific to election cases," *Purcell*, 549 U.S. at 4, attendant on enjoining the enforcement of a state's voting law while it is currently in play, and just weeks before an election.

**AFFIRMED**.

THOMAS, Chief Judge, dissenting:

Arizona has criminalized one of the most popular and effective methods by which minority voters cast their ballots. Because this law violates the Constitution and the Voting Rights Act, I must respectfully dissent.

I

Like most states, Arizona allows voters to cast a ballot on election day at a polling place, or to cast an early absentee vote, either in person or by mail. A.R.S. § 16-541. Early voting has become increasingly popular in Arizona, as evidenced by the fact that 81% of ballots cast in the last Presidential election were cast by early voting, a 12% increase from the 2012 election. An important reason for the increase in early voting is that Arizona has substantially reduced the number of polling places, resulting in extraordinarily long lines, with voters waiting many hours to cast their ballots. In one urban area, there is one voting center for nearly 70,000 registered voters. In some precincts in Maricopa County, voters waited for four hours to cast their ballots in the Presidential Preference Primary election earlier this year. In other precincts, the wait was up to six hours. Compounding the problem is that, in Maricopa County in particular, polling places change with each election, and the County is using a different polling place system for the general election than it did in the Presidential Preference election earlier this year.

As the use of early voting has skyrocketed in Arizona, voters have increasingly used friends, organizations, political parties, and campaign workers to transmit their ballots. Some efforts are typical of "get-out-the-vote" campaigns by

partisan groups; others are targeted to provide a service to those who cannot get to the polls.  Because of geographic and other impediments to voting, voting by ballot collection has become a critical means for minority voters to cast their ballots.  A substantial number of rural minority voters live in areas without easy access to mail service.  In urban areas, many minority voters are socioeconomically disadvantaged, meaning that they may lack reliable mail service and have to rely on public transportation to get to polling places.

Nonetheless, Arizona enacted the law at issue, House Bill 2023, *codified at* A.R.S. § 16-1005 (H)–(I), which imposes felony criminal sanctions for non-household members or caregivers who collect early ballots from others.  Plaintiffs filed this lawsuit challenging the law under the Voting Rights Act of 1965 and the First and Fourteenth Amendments to the United States Constitution.  The district court denied the plaintiffs' motion for a preliminary injunction, and this interlocutory appeal followed.

We review the denial of a preliminary injunction for abuse of discretion.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  A district court abuses its discretion if its analysis is premised on an inaccurate view of the law.  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014).  In such instances, we review *de novo* the legal premises underlying the preliminary injunction.  *Id.*[1]

---

[1] The majority believes the district court's findings of fact are reviewed by this Court for clear error because the district court has superior fact-finding capabilities.  Maj. Op. at 25.  The majority also believes a district court's answer to the ultimate question–whether there was a § 2 violation–is a finding of fact entitled to deference.  The majority cites *Gonzales* for that proposition.  However, the district court did not conduct any evidentiary hearings to resolve disputed factual issues, and

II

The district court erred in its analysis of the plaintiffs' Fourteenth Amendment claims. First, it erroneously employed a rational basis review standard, when the appropriate standard was a "balancing and means-end fit analysis." *Pub. Integrity All. v. City of Tucson*, 2016 WL 4578366, at \*3 (9th Cir. 2016) (en banc). As *Public Integrity Alliance* recognized, the Supreme Court established the appropriate standard of review for laws regulating the right to vote in *Burdick v. Takushi*, 504 U.S. 428 (1992). As we explained in *Public Integrity Alliance*:

> Under *Burdick*'s balancing and means-end fit framework, strict scrutiny is appropriate when First or Fourteenth Amendment rights "are subjected to 'severe' restrictions." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)). "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment

---

most of the record is undisputed, and the parties' submissions were by affidavit. Furthermore, the district court here did not determine whether there was a § 2 violation because, unlike in *Gonzales*, we are not yet at the merits stage of the inquiry. This is an appeal of a denial of a preliminary injunction, so we are reviewing the district court's determination that the plaintiffs are unlikely to succeed on the merits of their claims. In my view, the plaintiffs are likely to succeed on the merits and the district court reached the opposite conclusion because it made errors of law. Therefore, review is *de novo* as to those questions. *Pom Wonderful LLC*, 775 F.3d at 1123. Most of the district court's opinion involves a mixed question of law and fact. In election cases, as with other appeals, we review such decisions *de novo*. *United States v. Blaine County, Montana*, 363 F.3d 897, 909 (9th Cir. 2004).

rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564).

*Pub. Integrity All.*, 2016 WL 4578366, at *3.

However, rather than reviewing H. B. 2023 under a balancing and means-end fit analysis, the district court conducted a rational basis review, committing legal error.[2]

The second, and more important legal error, was that the district court misapplied the analysis required by *Burdick* and *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Under *Anderson-Burdick*, the court must weigh the nature and magnitude of the burden imposed by the law against the

---

[2] The majority concludes that because Arizona's regulatory interests are sufficient to justify the "minimal burden" imposed by H.B. 2023, "the district court was not required to conduct a means-end fit analysis here." Maj. Op. at 46–47. That is an erroneous interpretation of Supreme Court and our precedent. "The Supreme Court delineated the appropriate standard of review for laws regulating the right to vote in *Burdick v. Takushi*[:]" it is a "balancing and means-end fit framework." *Pub. Integrity All.*, 2016 WL 4578366, at *3. A court may not avoid application of a means-end fit framework in favor of rational basis review simply by concluding that the state's regulatory interests justify the voting burden imposed. Moreover, *Burdick* tells us that in weighing "the character and magnitude of the asserted injury" against the "precise interests put forward by the State as justifications for the burden imposed by its rule," we must take into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." 504 U.S. at 434. In this case, the State's asserted interest does not make necessary the substantial burden on the voting rights of minorities. Simply put, the State's end does not fit the means employed.

state's interest and justification for it.  *Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008).

The burden of the law on Arizona minority voters is substantial and occurs in both urban and rural areas of the state.  The uncontradicted evidence presented to the district court showed that a substantial number of minority voters used ballot collection as their means of voting.  As Maricopa Board of Supervisors Steve Gallardo testified: "ballot collectors are used in large part by Latino and Native American groups and [ballot collecting] has come to be critical in enabling voters in those communities to exercise their fundamental right to vote."

The record demonstrated that, in many rural areas with a high proportion of minority voters, home mail delivery was not available, and it was extremely difficult to travel to a post office.  No one contested the fact that the rural communities of Somerton and San Luis, which are comprised of 95.9% and 98.7% Hispanic voters, respectively, were without home mail delivery and reliable transportation.  As the representative for that district testified, "[b]ecause many of these voters are elderly and have mobility challenges, it is a common practice in this area to have one neighbor pick up and drop off mail for others on their street as a neighborly service."  The representative noted that there is only one post office, which is located across a highway crowded with cars waiting to cross the border, and is virtually inaccessible by foot.

Another example of the impact of the law on minority voters is the Tohono O'odham Indian Nation.  The Tohono O'odham reservation constitutes over 2.8 million acres in the Sonoran desert.  It is an area larger than Rhode Island and Delaware, and approximates the size of Connecticut.  It has

about 14,000 registered voters.  It does not have home mail delivery.  It has one post office, which is over 40 miles away from many residents. The evidence in this case shows that restrictions on ballot collection affect the Tohono O'odham tribe significantly.  No one contested the fact that the members of the Tohono O'odham Indian Nation have limited access to a postal service and no home mail delivery.

Similarly, no one disputed that members of the Cocopah Indian Tribe do not have home mail delivery or easy access to a post office.  The Cocopah Reservation is located along the lower Colorado River, south of Yuma, Arizona.  The Cocopah Reservation comprises approximately 6,500 acres, with approximately 1,000 tribal members who live and work on or near the Reservation.

As to urban areas, record evidence demonstrated that the burden of the law affected minority voters the most because of socioeconomic factors.  Minority voters in urban areas were more likely to be economically disadvantaged.  The record showed that many minority urban voters lived in places with insecure mail delivery; that many minority urban voters were dependent upon public transportation, which made election day in-person voting difficult; that many minority voters worked several jobs, making it difficult to take time off work to vote in person; and that many infirm minority voters did not have access to caregivers or family who could transmit ballots.

Martin Quezada, State Senator for Arizona's Twenty-Ninth Senate District testified that:

> I represent approximately 213,000 constituents, nearly 80% of which are ethnic

minorities. In particular, Hispanic citizens comprise 67% of the population of my district, the highest percentage of any district in the state of Arizona. My district is a working-class community, and many of my constituents depend on public transportation. [ . . . ] Many of my constituents were severely burdened by the long lines and lack of polling locations in the 2016 presidential preference election. My entire district only had one vote center, in Maryvale, to service the nearly 70,000 registered voters . . . .

The President of a nonprofit organization comprised of Latino citizens and community leaders testified that many minorities required assistance in making sure that they were following the proper voting procedure, and in low income areas they were concerned about the security of their mailboxes.

Further complicating voting in Arizona's urban areas is that there are not only few places to vote, but that the polling locations change frequently. Indeed, because the City of Phoenix elections are run independently by the City, a voter might have to go to two different polling places to cast ballots on election day. According to the Executive Director of a nonprofit organization working primarily in low-income African-American and Latino neighborhoods, this confusion significantly burdened those communities because many minorities had difficulty navigating the voting process, especially those Spanish-speaking voters who were not also fluent in English. The record also showed that election administrators were prone to make errors with Spanish-language materials. Those voters encounter significant

hurdles at polling places. Thus, the opportunity for early voting is especially important for those citizens.

The district court and the State dismiss the burdens imposed on minority voters seeking to vote early as attacks on a process that provides only a "more convenient" means of voting. However, when 80% of the electorate uses early absentee voting as the method by which they cast their ballots, the method has transcended convenience and has become instead a practical necessity. Thus, when severe burdens are placed on this form of voting, it has a significant impact on elections and the right to vote.

Against this burden, the state's justification for the law was weak. The state identified its interest as preventing voter fraud. However, the sponsors of the legislation could not identify a single example of voter fraud caused by ballot collection. Not one. Nor is there a single example in the record of this case. The primary proponent of the legislation admitted there were no examples of such fraud, but that the legislation was based on the speculative theory that fraud could occur. A study by the *Arizona Republic* found that, out of millions of ballots cast from 2005 to 2013, there were only 34 cases of fraud prosecution. All involved voting by felons or non-citizens. None involved any allegation of fraud in ballot collection. And none of the cases resulted in a conviction. A study by the National Republican Lawyers Association, which was dedicated to finding voter fraud and investigated evidence of potential fraud between 2000 and 2011, uncovered no example of fraud resulting from the collection and delivery of early ballots in Arizona. A follow-up analysis through May of 2015 failed to uncover any examples of ballot collection fraud. The plaintiffs produced numerous affidavits that attested that no one associated with

ballot collection had ever witnessed any voter fraud. Further, the record indicated that there are effective processes in place to handle any ballot that exhibits any signs that tampering has occurred. The Director of Elections for Maricopa County, the most populated county in Arizona, with a population of four times the next most populated county, testified at the legislative hearings that the County was well equipped to deal with voter fraud. Under state election procedure, voters can check the status of their ballot at any time. In short, the specter of voter fraud by ballot collection is much like the vaunted opening of Al Capone's vault: there is simply nothing there.

Thus, when one balances the serious burdens placed on minorities by the law against the extremely weak justification offered by the state, one can only conclude under the *Anderson-Burdick* analysis that the plaintiffs have established a likelihood of success on the merits of their Fourteenth Amendment claim.[3]   Based on the mostly uncontroverted

---

[3] The majority asserts that plaintiffs in this case are bringing a facial challenge to H.B. 2023 and they therefore bear a "heavy burden of persuasion" because such challenges "raise the risk of premature interpretation of statutes."    Maj. Op. at 40–41 (internal quotations omitted). It is worth noting that neither the plaintiffs nor the defendants categorize the challenge to H.B. 2023 as a facial challenge; only the majority opinion does so. It is also worth noting that securing a court's interpretation of the effects of H.B. 2023 before the law is enforced is the point of seeking a preliminary injunction. But for my part, I think this is a distinction without a difference because "[t]he underlying constitutional standard [in an as applied challenge] . . . is no different th[a]n in a facial challenge." *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) (quoting *Velazquez v. Legal Servs. Corp*., 462 F.3d 219, 228 (2d Cir. 2006)). "Facial and as-applied challenges differ in *the extent to which* the invalidity of a statute need be demonstrated (facial, in all applications; as-applied, in a personal application). Invariant, however,

record, the district court erred in misapplying *Anderson-Burdick*.[4]

III

The district court also erred in denying the motion for a preliminary injunction based on the Voting Rights Act claims. The Voting Rights Act of 1965 "was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century." *State of S.C. v. Katzenbach*, 383 U.S. 301, 308 (1966) a*brogated by Shelby Cty., Ala. v. Holder*, __ U.S. __, 133 S. Ct. 2612 (2013). The Act "implemented Congress' firm intention to rid the country of racial discrimination in voting. It provided stringent new remedies against those practices which have most frequently denied citizens the right to vote on the basis of their race." *Allen v. State Bd. of Elections*, 393 U.S. 544, 548 (1969).

The central purpose of the Act was "[t]o enforce the fifteenth amendment to the Constitution of the United States." *Chisom v. Roemer*, 501 U.S. 380, 383 (1991) (quoting Pub.L. 89–110, 79 Stat. 437, 42 U.S.C. § 1973 *et seq.*). The

---

is the *substantive rule of law* to be used. In other words, *how* one must demonstrate the statute's invalidity remains the same for both types of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether in a personal application or to all." *Velazquez*, 462 F.3d at 228 (emphasis in original).

[4] Plaintiffs assert an additional Constitutional claim under the First Amendment. In my view, the district court erred in concluding that H. B. 2023 did not burden their First Amendment associational rights. However, in my view, the district court did not abuse its discretion in denying a preliminary injunction based on this independent claim.

Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1.

At issue in this case is § 2 of the Act, which is "a restatement of the Fifteenth Amendment." *Roemer*, 501 U.S. at 392. Section 2 provides, without limitation, that any voting qualification that denies citizens the right to vote in a discriminatory manner violates the Voting Rights Act. 42 U.S.C. § 1973; *see also Allen*, 393 U.S. at 566–67 (noting that Congress intentionally chose the expansive language "voting qualifications or prerequisite to voting, or standard, practice, or procedure" for § 2 so as to be "all-inclusive of any kind of practice" that might be used by states to deny citizens the right to vote (internal quotation marks omitted)). As amended in 1982, § 2 makes "clear that certain practices and procedures that *result* in the denial or abridgment of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge." *Roemer*, 501 U.S. at 383–84.

To succeed on a § 2 claim, a plaintiff must show (1) that "the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" and (2) "that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014) (internal

quotations omitted); *see also Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016).

The district court made a number of legal errors in its analysis of the § 2 claims, warranting reversal.

A

The district court erred in holding, as a matter of law, that § 2 requires proof of the disparate impact of a law by "quantitative or statistical evidence comparing the proportion of minority versus white voters who rely on others to collect their early ballots." As the State concedes, there is no case law supporting this requirement; the district court relied only on cases it thought "strongly suggested" it.

Although quantitative or statistical measures of comparing minority and white voting patterns certainly may provide important analytic evidence, the district court erred in concluding that they were the exclusive means of proof. Indeed, the district court's conclusion is belied by the words of the Voting Rights Act itself, which provides that a violation of § 2 is "*based on the totality of the circumstances*." 52 U.S.C. § 10301(b) (emphasis added). The statute requires evidence that members of the affected minority class "have *less opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* (emphasis added). The statutory criterion is incompatible with the district court's restriction of proof to quantitative *denial* of *actual* minority voting compared with white voting. The relevant question is whether the challenged practice, viewed in the totality of the circumstances, places a disproportionate *burden* on the *opportunities* of minorities to vote. *Veasy*,

830 F.3d at 244–45; *League of Women Voters*, 769 F.3d at 240.  Even when analyzing the second part of the § 2 test, which does require causality, statistical analyses are not the exclusive method of showing a violation.[5]  *Veasy*, 830 F.3d 244.  Indeed, the Supreme Court has eschewed that approach in favor of consideration of various factors.   *Gingles*, 478 U.S. at 44–45.  Rather than narrowly interpreting the Voting Rights Act, the Supreme Court has emphasized its "broad remedial purpose of rid[ding] the country of racial discrimination in voting" and has explained that it provided "the broadest possible scope in combating racial discrimination."  *Roemer*, 501 U.S. at 403.  The district court's mechanical formulation is also at odds with the "totality of the circumstances" approach we underscored in *Gonzales v. Arizona*, 677 F.3d 383, 406 (9th Cir. 2012).  The district court's restriction constitutes legal error.

Even if we leave aside the irreconcilable conflict between the district court's proposed rule and the requirements of the

---

[5] The majority opines that "[w]hile § 2 itself does not require quantitative evidence, past cases suggest that such evidence is typically necessary to establish a disproportionate burden."  Maj. Op. at 28.  The majority also notes that plaintiffs' briefs rely on vote dilution cases but not vote denial cases in arguing that statistical evidence is not required to establish a § 2 violation.  Maj. Op. at 29 fn. 14.  I perceive no reason why the type of § 2 case on which plaintiffs rely is of consequence to their argument about what § 2 itself requires.  Likely plaintiffs could not rely on a vote denial case for the stated proposition because of the practical reality that in a vote denial case, quantitative evidence of the effect of a rule on voting behavior is only available after an election has occurred, at which point the remedial purpose of the Voting Rights Act is no longer served.  Plaintiffs in vote dilution cases, in contrast, can often gather and analyze quantitative data before an election.  *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30 (1986).

governing statute, the district's approach is still fatally flawed.

First, quantitative measurement of the effect of a rule on the voting behavior of different demographic populations must necessarily occur after the election.  One cannot statistically test the real world effect of a rule in the abstract; it can only be measured by actual voting data.  In other words, imposition of the district court's proposed rule would mean that there could never be a successful pre-election challenge of the burdens placed on minority voting opportunity because no data will have been generated or collected.  The analysis could only occur after the harm had been inflicted.  That result cannot be squared with the broad remedial purposes of the Voting Rights Act.  The Fifth Circuit, in rejecting an approach similar to the district court's, acknowledged this problem, observing that requiring such proof would "present[] problems for pre-election challenges . . . when no such data is yet available." *Veasey*, 830 F.3d at 260.

Second, the relevant data is not available in Arizona.  The State concedes that it does not collect the necessary data, and asserts that it should not bear that burden in the absence of a law that requires it to do so.  The State suggests that plaintiffs should use data from those organizations who collect ballots.  Of course, that action would now be a felony.  But leaving that aside, there would be no practical way for the plaintiffs to collect comparative data by that method because it is highly unlikely they could force competing organizational groups to collect and supply the data.  And such a method would not likely yield true comparative results.  At best, it would show that white voters and minority voters both have used ballot collection as a means for casting their ballots.  No

one disputes that, nor does anyone seriously dispute the fact that minority citizens are especially dependent on ballot collection has a means of voting.  Further, even if past data were available, it still would not answer the district court's query because the data gathered would be pre-rule, and therefore not relevant as a means of assessing the rule's impact.

Third, the district court acknowledged the difficulty of obtaining the data because "election and other public records often do not include racial or ethnic data," and noted that "[t]here is no getting around this problem."  Nonetheless, the court held that the statute still required a threshold statistical showing, even though collecting such evidence was likely impossible.  That was not the intent of the Voting Rights Act, and it is just such a circumstance that requires assessment of the "totality of the circumstances."

Fourth, in its examination of the plaintiffs' evidence, the district court erred in its comparative analysis.  It faulted the plaintiffs for not showing comparative data from other rural white-centric areas.  But that is not the examination required by the Voting Rights Act.  Section 2 examines whether "members of the protected class have less opportunity *than other members of the electorate* to participate in the political process and to elect representatives of their choice." *Veasey*, 830 F.3d at 305; *League of Women Voters of N.C.*, 769 F.3d at 240 (emphasis added).  It does not test opportunity against "other members of the electorate" who are "similarly situated."  Thus, contrary to the district court's analysis, the comparison is not with similarly situated white groups, but rather with the voting population as a whole.  If the district court's assumption were correct, then literacy and poll tax statutes would be constitutional because they placed the

burdens on illiterate and poor whites and blacks equally. Instead, the Voting Rights Act focuses on the burdens disproportionately place on minorities in comparison with the general voting population. Native American voters living on reservations have different burdens as to transportation and mail access than urban white voters. A state may not evade the requirements of § 2 by arguing that it equally applies to a subset of white voters constituting a minuscule percentage of the white vote, when the overall effect is the suppression minority voting.

And even if we were to take the district court's analysis at face value, it fails in consideration of the evidence in this case. The district court's conclusion is at odds with the evidence showing the law disproportionately burdens minorities. I have previously described the situation faced by the Tohono O'odham Nation, situated on 2.8 million acres, with limited access to a post office and no home mail delivery. Everyone concedes that there is no white population analogue. There are no white reservations in Arizona. There is no comparably sized rural area that encompasses a white-majority population. The record evidence was plain and uncontroverted: H.B. 2023 places a disproportionate burden on the voting opportunities of members of the Tohono O'odham tribe in comparison with the population of white voters.

The evidence provided by the plaintiffs showed a similar pattern in urban areas. Minority voters encountered significant burdens in exercising their right to vote. The reduced number of polling places meant that voters had to wait hours in line to cast ballots. Low income voters had difficulty getting to the polls because of their dependence on public transportation. Voters who were not fluent in English

had difficulty determining where to vote. Statistical evidence is not needed to see that without ballot collecting, these voters will have less opportunity than other members of the electorate to participate in the political process.

In sum, the district court committed legal error by requiring the plaintiffs to show proof of the disparate impact of the law by "quantitative or statistical evidence comparing the proportion of minority versus white voters who rely on others to collect their early ballots." That formulation is at odds with the governing statute, which requires analysis by "totality of the circumstances" of whether members of the affected minority class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

## B

The district court also erred as a matter of law in its assessment of the plaintiffs' burden of proof. "[T]he burden of proof at the preliminary injunction phase tracks the burden of proof at trial . . . ." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011). In a voting rights case, the plaintiff bears the burden of proof at trial and must show a violation by a preponderance of the evidence. *Bartlett v. Strickland*, 556 U.S. 1, 19–20 (2009). Thus, the parties seeking a preliminary injunction in this case must show they are likely to prevail on the merits; if the plaintiffs satisfy that burden, then the opposing parties bear the burden of rejoinder. *Thalheimer*, 645 F.3d at 1116.

Here, the district court rejected plaintiffs' tendered evidence because it was not "compelling." At the preliminary

injunction stage, the plaintiff is not required to present "compelling" evidence, but only to establish a likelihood of success by a preponderance of the evidence. The district court also rejected the tendered evidence as "anecdotal," but the Supreme Court has considered and credited just such evidence. At the preliminary injunction stage, plaintiffs were obligated to show a likelihood of success in showing that "members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

Much of the evidence tendered by the plaintiffs as to this burden was not controverted. As I have noted, no one contested the fact that the rural communities of Somerton and San Luis, which are comprised of 95.9% and 98.7% Hispanic voters, respectively, were without home mail delivery and reliable transportation. No one contested the fact that the members of the Tohono O'odham Indian Nation do not have home mail delivery. No one disputed that members of the Cocopah Indian Nation do not have home mail delivery. The plaintiffs submitted voluminous affidavits showing the burden that the restriction on ballot collection would impose on minorities. The State did not contest the affidavits, but simply dismissed the evidence as "anecdotal." Thus, much of the evidence tendered by the plaintiffs as to the disproportionate burden on minority voters was either completely undisputed or uncontested.

However, once the plaintiffs had established the burden on minority voters, the district court did not place the burden of rejoinder on the State. Rather, it categorically rejected evidence based on personal knowledge as "anecdotal," and held that the plaintiffs were required to show that rural white voters were not similarly burdened. In other words, once the

plaintiffs had established the burden on minority voters, the district court imposed a higher standard of proof, rather than shifting the burden of rejoinder to the State.  The record provides no information as to rural white voters.  The district court viewed that as fatal to the plaintiffs' claims.  In fact, it meant that the plaintiffs had satisfied their threshold requirements, and the State had failed to rejoin. The district court erred in holding the plaintiffs to a higher evidentiary burden.

C

The district court did not reach the second prong of the § 2 analysis, namely, whether the burden was in part caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.  Nevertheless, the plaintiffs established a likelihood of success on the second prong.

As to the second part of the analysis, the Supreme Court has identified several factors to be taken into consideration, consistent with the legislative history of the Voting Rights Act, namely:

> (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> (2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals; and

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 37. In addition, the Court added that in some cases, there was probative value in inquiring "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group" and "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or

procedure is tenuous." *Id.* (citing S. Rep., at 28–29, U.S.Code Cong. & Admin. News 1982, pp. 206–207).

As to the first factor, the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process, Arizona has had a long history of imposing burdens on minority voters. In 1912, shortly after gaining statehood, Arizona imposed a literacy test for voting. In Cochise and Pima Counties, the denial of the right to vote meant that nearly half the precincts lacked enough voters to justify holding primary elections in 1912. From 1912 to the early 1960s, election registrars applied the literacy test to reduce the ability of African Americans, Native Americans, and Hispanics to register to vote. In an action filed against Arizona to enforce the Voting Rights Act, the United States Justice Department estimated that 73,000 people could not vote because of the existence of the literacy test.

The passage of the Voting Rights Act in 1965 caused the suspension of the literacy test in Arizona, but the statute remained in effect until it was repealed in 1972, after Congress banned its use in 1970 through an amendment to the Voting Rights Act. Arizona subsequently unsuccessfully challenged the Congressional ban on literacy tests. *Oregon v. Mitchell*, 400 U.S. 112, 118 (1970). In *Mitchell*, the Court noted that, in Arizona, only two counties out of eight with Hispanic populations in excess of 15% showed voter registration equal to the state-wide average. *Id.* at 132. In the 1960s, there were a number of initiatives to discourage minority voting in Arizona, such as "Operation Eagle Eye." Under Operation Eagle Eye, minority voters were challenged at the pools on a variety of pretexts, with the goal of

preventing minority voting or slowing down the process to create long lines at the polls and discourage voting.

Native Americans in Arizona especially suffered from voting restrictions.  Although Native Americans were U.S. citizens, the Arizona Supreme Court held in 1928 that they could not vote because they were under federal guardianship. *Porter v. Hall*, 271 P. 411,  419 (Ariz. 1928).  Even after that ban was overruled in 1948 in *Harrison v. Laveen*, 196 P.2d 456 (Ariz. 1948), Native Americans faced significant obstacles to voting.  *See generally*, Patty Ferguson-Bohnee, *The History of Indian Voting Rights in Arizona: Overcoming Decades of Voter Suppression*, 47 Ariz. St. L. J. 1099, 1112 (2015).

Because of its long history of imposing burdens on minority voting, Arizona became one of nine states subject to the pre-clearance requirements of the Voting Rights Act after it was amended in 1975 to protect language minorities. 40 Fed. Reg. 43746.  Under the pre-clearance provision, Arizona was required to obtain the approval of the United States Department of Justice before implementing any law affecting the voting rights and representations of minorities. Since 1982, the Department of Justice has vetoed four statewide redistricting plans proposed by Arizona that appeared to discriminate against minorities.  When Arizona was subject to the pre-clearance requirements of § 5, a bill precluding or criminalizing ballot collection passed the Arizona legislature, but was ultimately repealed due to concerns about Justice Department approval.  In 2013, the Arizona legislature passed a measure banning partisan ballot collection, the violation of which was a misdemeanor.  It was repealed after its repeal was placed on the ballot by

referendum. The plaintiffs established a likelihood of success as to the first factor.

As to the second factor, the extent to which voting in the elections of the state or political subdivision is racially polarized, Arizona has had a history of racially polarized voting. The plaintiffs provided expert testimony detailing the history of polarized voting. Statistical analysis showed the sharp polarization between white and non-white voters.

For the reasons described in the discussion of factor one, the plaintiffs demonstrated a likelihood of success as to factor three, namely, the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.

Because the voting access issues affect the right to vote for a candidate, the fourth factor concerning the candidate slating process is not relevant.

The fifth factor, the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process, falls decisively in favor of the plaintiffs. The plaintiffs tendered significant evidence showing that Arizona minorities suffered in education and employment opportunities, with disparate poverty rates, depressed wages, higher levels of unemployment, lower educational attainment, less access to transportation, residential transiency, and poorer health.

The plaintiffs also provided substantial evidence as to the sixth factor, namely, whether political campaigns have been characterized by overt or subtle racial appeals.

Finally, the plaintiffs provided evidence supporting the seventh *Gingles* factor, namely, the extent to which members of the minority group have been elected to public office in the jurisdiction. As of January 2016, Hispanics constituted over 30% of the population, but held only 19% of the seats in the Arizona legislature. African-Americans made up 4.7% of the population, but held 1% of the legislative seats. Native Americans fared slightly better, constituting 5.3% of the population and holding 4.4% of the legislative seats.

But the *Gingles* factors are not the end of the story. We are obligated to look to the "totality of the circumstances." 52 U.S.C. § 10301(b). In this election, in-person voting opportunities are significantly hindered by lack of polling places and significant changes in polling places, all of which have caused extraordinarily long lines for voting in person, up to six hours in some locations. This hindrance to in-person voting falls most heavily on minorities. So, the cited "opportunities" for alternate voting are illusory. H. B. 2023 has now imposed additional significant burdens on minorities as to their ability to cast their ballots early through the popular means of ballot collection. The totality of the circumstances of this election, coupled with the historic discrimination in Arizona's electoral politics are sufficient to satisfy the second § 2 requirement. In sum, the plaintiffs established a likelihood of success in proving the *Gingles* factors at stage two of the § 2 analysis.

D

The plaintiffs established a likelihood of success on the § 2 Voting Rights Act claim. They established that the criminalization of ballot collection meant that minority voters had less opportunity than other members of the electorate to elect representatives of their choice, and that the burden in part was caused by or linked to social and historical conditions that have or currently produce discrimination against minorities.

IV

The district court should have granted the motion for a preliminary injunction. The district court made a number of legal errors. The plaintiffs established that the anti-ballot-collection law significantly burdens the voting rights of minorities, particularly Hispanic and Native American voters. The State's justification of preventing voter fraud was not, and is not, supportable. One of the most popular and effective methods of minority voting is now a crime. H. B. 2023 violates the Constitution and the Voting Rights Act.

There are many burdens and challenges faced in Arizona by Native Americans, Hispanics, African-Americans, the poor, and the infirm who do not have caregivers or family. With H.B. 2023, Arizona has added another: disenfranchisement.

I respectfully dissent.

*Feldman v. Arizona Sec'y of State*, No. 16-16698

O'SCANNLAIN, Circuit Judge, with whom CLIFTON, BYBEE, and

CALLAHAN, Circuit Judges, join, and with whom N.R. SMITH, Circuit Judge,

joins as to Parts I, II, and III, dissenting from the order enjoining the State of

Arizona:

The court misinterprets (and ultimately sidesteps) *Purcell v. Gonzalez*, 549

U.S. 1 (2006), to interfere with a duly established election procedure *while voting*

*is currently taking place*, contrary to the Supreme Court's command not to do so. I

thus respectfully dissent from this order enjoining the state of Arizona from

continuing to follow its own laws during an ongoing election. And let there be no

mistake: despite the majority's pretenses to the contrary, the order granting the

injunction *is* a ruling on the merits, and one based on an unnecessarily hasty review

and an unsubstantiated statutory and constitutional analysis.[1]

---

[1] The order alternately discusses whether to grant an "injunction" pending appeal, Order at 2, and a "stay" pending appeal, *id.* at 2, 8. Stays and injunctions are two different things: a stay postpones the judgment or order of a court; an injunction, of course, commands or prohibits action by a third party. *See, e.g.*, Fed. R. App. P. 8 (Stay or Injunction Pending Appeal); "Injunction," Black's Law Dictionary (10th ed. 2014); "Stay," Black's Law Dictionary (10th ed. 2014). Because before today no court has ordered Arizona not to enforce H.B. 2023, the majority presumably means that today it issues an injunction against the State from

(continued...)

I

Some background: On September 23, 2016, the district court denied plaintiffs' motion for a preliminary injunction blocking Arizona from implementing certain provisions in Arizona House Bill 2023 (H.B. 2023). These provisions limit the collection of voters' early ballots to family members, household members, certain government officials, and caregivers. Plaintiffs appealed. A Ninth Circuit motions panel *unanimously denied* plaintiffs' emergency motion for an injunction pending appeal on October 11. That same panel *sua sponte* amended its October 11 ruling to expedite the appeal on October 14. A merits panel received briefing, heard oral argument, and issued an opinion on October 28, affirming the district court and denying the request for a preliminary injunction by a two-to-one majority. The case was called en banc the same day the opinion was issued. Eschewing our normal en banc schedule, memo exchange was compressed into five days, as opposed to our customary thirty-five. Now, just two days after the en banc call succeeded, and just four days before Election Day, the majority overturns the district court, a motions panel, and a separate merits panel to reach its desired result.

---

[1](...continued)
enforcing a particular statute.

## II

The Supreme Court counseled against just this type of last-minute interference in *Purcell*. That case also involved our court's issuing a last-minute injunction against the enforcement of a contested Arizona election law. 549 U.S. at 2–4. The Supreme Court, on October 20, 2006, vacated that injunction, which had been implemented by a Ninth Circuit motions panel on October 5—more than four weeks before the election. *Id.* at 2–3. In doing so, the Court stressed the "imminence of the election" and the need to give the case adequate time to resolve factual disputes. *Id.* at 5–6. Despite *Purcell*'s direct impact on this case, the majority confines that decision much too narrowly, and in its strained attempt to distinguish *Purcell*, disregards how this eleventh-hour injunction will impact the current election and many elections to come.

At first, it seemed that we might respect Supreme Court precedent this time around, when first the motions panel, and later the three-judge merits panel, wisely determined that no injunction should issue at this stage. Yet, after a third bite at the apple, here we are again—voiding Arizona election law, this time *while voting is*

*already underway*[2] and only *four days* before Election Day. In doing so we depart from our own precedent, *see, e.g.*, *Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012) (staying a district court's injunction "given the imminent nature of the election"), and myriad decisions of our sister circuits, *see, e.g.*, *Crookston v. Johnson*, No. 16-2490, 2016 WL 6311623, at *2 (6th Cir. Oct. 28, 2016) ("Call it what you will — laches, the *Purcell* principle, or common sense — the idea is that courts will not disrupt imminent elections absent a powerful reason . . . ."); *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014) (staying an injunction "in light of the importance of maintaining the status quo on the eve of an election"); *Colon-Marrero v. Conty-Perez*, 703 F.3d 134, 139 n.9 (1st Cir. 2012) (noting that "even where plaintiff has demonstrated a likelihood of success, issuing an injunction on the eve of an election is an extraordinary remedy with risks of its own"). We also disregard not only *Purcell*, but other Supreme Court authority disfavoring last-minute changes to election rules. *See*, *e.g.*, *North Carolina v. League of Women Voters of N.C.*, 135 S. Ct. 6 (2014) (granting stay to prevent interference with election procedures roughly one month before election).[3] In all these cases, "the

---

[2] Early voting in Arizona began more than three weeks ago, on October 12.

[3] Likewise, the Court stayed a permanent injunction imposed by a district court and affirmed by the Sixth Circuit on September 24, 2014, which would have

(continued...)

4

common thread [was] clearly that the decision of the Court of Appeals would change the rules of the election too soon before the election date." *Veasey*, 769 F.3d at 895.

The majority recognizes the need to address *Purcell* and its progeny. But the majority's strained attempt to distinguish those cases is unconvincing—its reasoning either misrepresents *Purcell* or is irrelevant to the issues at hand. And it misses the main point of *Purcell*: the closer to an election we get, the more unwarranted is court intrusion into the status quo of election law.

A

First, the majority makes the incomprehensible argument that its injunction "does not affect the state's election processes or machinery." Order at 3. The majority cites no law, fact, or source of any kind in support of this argument, and it is dubious on its face. Of course, H.B. 2023 directly regulates the state's election processes or machinery: it governs the collection of ballots, which obviously is

---

³(...continued)
required Ohio to add early in-person voting hours. *See Husted v. Ohio State Conference of N.A.A.C.P.*, 135 S. Ct. 42 (2014), *rev'g sub nom. Ohio State Conference of N.A.A.C.P. v. Husted*, 768 F.3d 524 (6th Cir. 2014). And, in *Frank v. Walker*, the Court vacated the Seventh Circuit's September 26, 2014 stay of a preliminary injunction enjoining application of Wisconsin's voter ID law, which had been put in place by the district court in April 2014. *See* 135 S. Ct. 7 (2014)*, rev'g in part*, *Frank v. Walker*, 769 F.3d 494 (7th Cir. 2014), *rev'g*, 768 F.3d 744 (E.D. Wis.).

integral to how an election is conducted. But under the majority's Orwellian logic, regulations affecting get-out-the-vote operations are somehow not regulations of the "electoral process." (What are they, then, one might ask? The majority does not tell.) Apparently, the majority believes that only measures that affect the validity of a vote itself (or a voter herself) affect such process. Other courts, in ruling on similar regulations, have rejected the majority's view, and widely held that regulations of many aspects of an election beyond the validity of a vote affect the election process. *See, e.g.*, *Lair*, 697 F.3d at 1214 (staying injunction of certain campaign finance laws); *see also Harris v. Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984) (observing that even the racial composition of polling officials could affect the election process).

Tellingly, the majority barely addresses whether enjoining H.B. 2023 will create confusion and disruption in the final days of the election—a key factor in the *Purcell* decision. 549 U.S. at 4–5 ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls."). And, based on this record, how could it? Factual development in the record is sparse. The majority says its injunction will be less disruptive than the *Purcell* injunction, but offers not a shred of empirical proof for this proposition. Order at 3–5. At this point, it appears that no

6

one knows just how much confusion this court risks by issuing this injunction, after weeks of procedures suggested it would not.[4] What we do know is that the State has approximately four days to figure out and to implement whatever response is necessary to accommodate our latest view of the case. If requiring such action is inappropriate four weeks prior to Election Day, *see Purcell*, 549 U.S. at 3–4, it surely is in the waning days of voting. The Supreme Court could not have been clearer: "[a]s an election draws closer, that risk [of disruption] will increase." *Id.* at 5.

B

The majority's second argument—that this case is different because it involves a law that imposes criminal penalties—manages to be both irrelevant and incorrect. It is irrelevant because *Purcell* never says, or even indicates, that whether a law imposes criminal penalties affects whether the status quo should be upset right before an election. It is incorrect because our own circuit applied *Purcell* in a case involving a law that affected the electoral process and imposed criminal

---

[4] This lack of factual support is a recurring theme, and another reason this court should wait until after the election to act. *See Purcell*, 549 U.S. at 6 (Stevens, J., concurring) ("Allowing the election to proceed without enjoining the statutory provisions at issue will provide the courts with a better record on which to judge their constitutionality."). This court should "take[] action[s] that will enhance the likelihood that [important factual issues] will be resolved correctly on the basis of historical facts rather than speculation." *Id.*

penalties. *See Lair*, 697 F.3d at 1214 (staying an injunction that applied to Montana campaign finance law enforced by criminal penalties).

C

Third, the majority misreads *Purcell* by inventing a supposed *Purcell* Court concern that the federal judiciary was "disrupt[ing] long standing state procedures" and then equating it with the majority's desire to preserve the pre-H.B. 2023 status quo. Order at 5. Nowhere in *Purcell* does the Court mention "long standing state procedures." Proposition 200, the voter identification law at issue in *Purcell*, had been approved by Arizona voters in 2004 and was not precleared until May of 2005. 549 U.S. at 2. The 2006 election was the first federal election at which it would go into effect. The voter identification law was relatively new, but, "[g]iven the imminence of the election," the Court overturned our injunction which would have returned Arizona to a pre-Proposition 200 world, the majority's so-called "status quo." *Id.* at 5. Obviously, *Purcell* was actually concerned with changes to the status quo that had occurred within weeks of an election.

And that status quo can be a law or an injunction that has been in place for just a few months. *See Frank*, 135 S. Ct. at 7. In *Frank*, the Supreme Court vacated the Seventh Circuit's September 26, 2014 stay of a preliminary injunction enjoining application of Wisconsin's voter ID law, which had been put in place by

8

the district court in April 2014. By the time the Seventh Circuit issued its decision, the injunction had become the new "status quo," even the dissent had to concede the "colorable basis for the Court's decision." *Id.* at 7 (Alito, J., dissenting). The dissent noted that given the "proximity of the election," it was "particularly troubling that absentee ballots [relying on the injunction] ha[d] been sent out without any notation that proof of photo identification must be submitted." *Id.*

D

Fourth, the argument that "unlike the circumstances in *Purcell* and other cases, plaintiffs did not delay in bringing this action" continues the majority's pattern of inventing facts. Order at 5. Nowhere in *Purcell* does the Supreme Court discuss the timing of the plaintiffs' filing. Nowhere does it say that the plaintiffs affected their chances of success by delaying their filing. Nowhere does it use this factor in its analysis. Indeed, as recounted above, the Supreme Court is far more focused on the date of court orders that upset the status quo in relation to the date of the election. *See*, *e.g.*, *League of Women Voters*, 135 S. Ct. at 6 (staying an injunction ordered by the Fourth Circuit a month before the election despite the fact that plaintiffs challenged the statute at issue a year prior to the election).

9

## E

Finally, perhaps betraying its real motivation, the majority bafflingly suggests that our last-minute intervention is required now that the Supreme Court struck down the federal preclearance mechanism in *Shelby County v. Holder*, 132 S. Ct. 2612, 2631 (2013). But, whatever the majority might think of that opinion, *Shelby County* has absolutely no relevance to the Court's decision in *Purcell*.

The majority is correct about one basic point: in discussing the procedural history in *Purcell*, the Supreme Court *mentioned* that the regulation at issue had been precleared. 549 U.S. at 2. But the Court did not suggest that preclearance was in any way relevant to its decision. Despite the majority's oblique citation to *Purcell*, one will not find any support in that decision for its statement that preclearance meant the law in *Purcell* was presumptively valid—or that any such presumption mattered at all to the question before the Court. Quite to the contrary, the Supreme Court explicitly cautioned that it was *not* addressing the merits of the claim in *Purcell*. *Id.* at 5 ("We underscore that we express no opinion here on the correct disposition, after full briefing and argument, of the appeals [from the district court] . . . .").

Even if the majority believes that courts should engage in a heightened review of voting laws after *Shelby County*—and I stress the Supreme Court has

given us absolutely no reason to believe we should—that does not support the notion that such review matters at this stage of litigation. *Purcell* is plainly about the impact a court order will have on an upcoming (or in our case, ongoing) election, *not* the merits of the constitutional claim underlying that order. *Id.* Pre-clearance, *Shelby County*, and the merits of the challenge to H.B. 2023 are beside the point. Four days before an election is not an appropriate time for a federal court to tell a State how it must reconfigure its election process.

### III

Unfortunately, though I believe the merits should not have been reached until a more thorough review of the case could have been conducted—and ideally more evidence could have been collected, including quantitative data—the majority's decision to consider and then to grant an injunction pending appeal forces the issue. In doing so, and given the current record, the majority, by adopting Chief Judge Thomas's dissent, makes various errors in both its constitutional and federal statutory analysis that further undermine its argument that an injunction is necessary. Order at 2 (adopting the reasoning of *Feldman v. Arizona Sec'y of State*, No. 16-16698, 2016 WL 6427146, at \*21–31 (9th Cir. Oct. 28, 2016) (Thomas, C.J., dissenting)). This situation means we are forced to reach

11

the merits as well. *See* Order at 2 (citing *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983)).

Unlike the majority, we are persuaded by the analysis of the vacated three-judge panel majority opinion and the district court opinion. *Feldman*, 2016 WL 6427146, at *1–21; *Feldman v. Arizona Sec'y of State*, No. CV-16-01065-PHX-DLR, 2016 WL 5341180 (D.C. Ariz. Sept. 23, 2016) [hereinafter *Feldman (D.C.)*]. A few key points, some contained in those opinions, are worth highlighting. One error in the majority's reasoning stands out the most—its failure even to pretend to give any deference to the district court's denial of exactly the same request. *See Purcell*, 549 U.S. at 5 (concluding that the failure of "the Court of Appeals to give deference to the discretion of the District Court . . . was error").

A

The majority's Fourteenth Amendment analysis falsely claims the district court improperly conducted a "rational basis" review. *Feldman*, 2016 WL 6427146, at *21 (Thomas, C.J., dissenting). Yet, the district court never used the phrase "rational basis," instead it explicitly stated that Arizona "must show [] that

it[s law] serves important regulatory interests," after it conducted the burden analysis.[5] *Feldman (D.C.)*, 2016 WL 5341180, at *11.

The majority argues that H.B. 2023 imposes a "substantial burden" on voting, but this cannot be reconciled with the fact six Justices in *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008), found that Indiana's voting ID law imposed either a "a limited burden," *id.* at 202 (Stevens., J., writing for three justices), or a "minimal" one, *id.* at 204 (Scalia, J., writing for three justices). The majority does not even try to argue that H.B. 2023 imposes more of a burden on voters than the Indiana law, instead it just does not cite *Crawford*.

The majority argues that the "state's justification for the law was weak." *Feldman*, 2016 WL 6427146, at *24 (Thomas, C.J., dissenting). This cannot be reconciled with *Crawford*'s language that "[t]here is no question" that a state's interest in preventing voter fraud is an important interest. 553 U.S. at 194–197 (holding this even though there was no evidence in the record that the particular type of voting fraud the law was trying to prevent has occurred). Arizona's interest in protecting public confidence in elections is also an established important

---

[5] Rational basis review only requires the legislature to have some rational reason for the law, even if it is not important and even if the judge, rather than the legislature, proffers that reason. *E.g.*, *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 487–88 (1955).

13

interest. *Id.* at 197. Once again the majority "solves" this problem by pretending that *Crawford* does not exist.

B

The majority's Voting Rights Act of 1965 (VRA) Section 2 analysis is equally shoddy. 52 U.S.C. § 10301. It concedes that no statistical or quantitative evidence exists in the record. *Feldman*, 2016 WL 6427146, at \*27 (Thomas, C.J., dissenting). It concedes that "the Voting Rights Act focuses on the burdens disproportionately place [sic] on minorities *in comparison with the general voting population.*" *Id.* at 27 (emphasis added). It concedes that "[t]he relevant question is whether the challenged practice . . . places a *disproportionate burden* on the *opportunities* of minorities to vote." *Id.* at 26. It concedes the burden lies with the plaintiffs and that "the parties seeking a preliminary injunction in this case must show they are likely to prevail on the merits." *Id.* at 28.

Yet, it then argues that the district court erred by asking plaintiffs to show the burden on minority voters was greater than that of white voters. *Id.* at 28–29. But the plaintiffs had the burden of showing disparate treatment. Instead of acknowledging that the current record's lack of facts showing a disparate impact is fatal to this claim, the majority invents a burden-shifting requirement. *Id.* at 21–22. It argues that "once the plaintiffs had established the burden on minority voters"

14

the district court erred by not "shifting the burden of rejoinder to the State." *Id.* at 29. This burden-shifting requirement—which would require the state to prove a negative (no disparity if minorities are burdened)—has no support in the law.

IV

Finally, the unusual procedural history leading up to this decision and the contrived time pressure we placed ourselves under in rendering this decision underscores exactly why courts refrain from intervening in elections at the last minute unless they absolutely have to.[6]

After presumably fuller consideration than our own, a district court judge, a three-judge motions panel, and a two-judge majority of a separate merits panel all rejected Feldman's attempt to have enforcement of H.B. 2023 enjoined for the current election. Yet, with only three days of review (and no oral argument), a majority of our hastily constructed en banc panel has reversed course, requiring Arizona to change its voting procedures the weekend before Election Day. The record presented in this appeal exceeds 3000 pages; the parties' briefs (which now total five, after additional en banc briefing) present complex and well-reasoned arguments; and the alleged constitutional violations are serious. But our en banc

---

[6] Sometimes we are forced to act under time pressure, such as death penalty habeas review, but while the final orders may issue hours before execution, these cases are usually the cumulation of years of carefully considered litigation.

15

panel has found it appropriate (indeed imperative) to resolve the matter in less time than we might usually take to decide a motion to reschedule oral argument.

Despite the majority's pretenses to having "given careful and thorough consideration" to the issues presented in this case, Order at 7, one wonders how much the obvious dangers inherent in our rushed and ad hoc process have infected the decision in this case. *Cf. Purcell*, 127 S. Ct. at 6 (Stevens, J., concurring) ("Given the importance of the constitutional issues, the Court wisely takes action that will enhance the likelihood that they will be resolved correctly on the basis of historical facts rather than speculation.").

The circumstances of this case do not inspire confidence in the majority's order. First, the majority does not appear even to have resolved what to label the relief it has determined must be handed down in this case.[7] More concerning, and as discussed above, the order fails seriously to grapple with controlling Supreme Court precedent pertaining both to appropriateness of our action at this stage of litigation and to the underlying merits of the issues in this case. The order also wholly fails to explain why it is now necessary to overrule a unanimous order from October 11—which was approved by one of the judges who now joins the majority—denying an identical emergency motion in this same case. We are left

---

[7] *Supra* note 1.

16

only to wonder why that decision, acceptable four weeks ago, is now the cause for immediate correction.

Worse still is the precedent this hastily crafted decision will create. The majority purports to delay ruling on the merits of the challenge to H.B. 2023—presumably so that this case can be carefully considered. Order at 8. But it "essentially" adopts the reasoning of a twenty-nine page dissent from the original three-judge panel opinion, Order at 2, which concludes that it is clear "this law violates the Constitution and the Voting Rights Act." *Feldman*, 2016 WL 6427146, at *21 (Thomas, C.J., dissenting). If our court agrees with the essence of that dissent, what is left to decide after oral argument? The majority's framing of this issue as just a "stay," Order at 8, only obfuscates the fact that our en banc panel has blocked Arizona's voting law, declared it presumptively unconstitutional, and overturned the status quo the weekend before voting ends, all without first taking the time needed to gain a thorough mastery of the record, to hear oral argument from the parties, or to write a considered opinion.

As the majority is quick to remind us, the issues in this case are important.[8] Those issues deserved more than seventy-two hours of consideration. This court's hasty rush to decide those issues on the basis of ad hoc procedure is regrettable. I fear our action in this case will set a precedent that will harm not only the current election in Arizona, but presumably many more down the line, whenever a State enacts a voting regulation that more than half of the active judges on the Ninth Circuit simply deem unwise.

I respectfully dissent.

---

[8] Indeed, the majority strongly implies the issues are *so important* that they need to be decided right away. But every voting rights case pits similar arguments about the fundamental right to vote against arguments about a State's need and right to regulate its elections. *See, e.g., Crawford*, 553 U.S. at 191.

To accept the majority's argument that the importance of this case compels action leaves one wondering what change in election law would not qualify as important. *Cf. Clingman v. Beaver*, 544 U.S. 581, 593 (2005) ("To deem ordinary and widespread burdens [on voting] like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes."). This "importance" exception would whittle *Purcell* down to nothing. As Justice Stevens explained in *Purcell*, it is precisely *because* these issues are important that we should not rush to decide them. *See*, 549 U.S. at 6 (Stevens, J., concurring).

*Feldman v. Arizona Secretary of State*, No. 16-16698

Bybee, Circuit Judge, with whom Circuit Judges O'Scannlain, Clifton, Callahan, and N.R. Smith join, dissenting:

I join in full Judge O'Scannlain's dissent. I write separately to emphasize two brief points: First, Arizona's restrictions on who may *collect* an early ballot—a question very different from who may *vote* by early ballot—follows closely the recommendation of the bipartisan Commission on Federal Election Reform. Second, the Arizona early ballot law at issue here is a common provision, and similar restrictions on the collection of early or absentee ballots may be found on the books of some twenty-one states. Those provisions have been in effect for decades, and they have been enforced. Unless the Voting Rights Act means that identical provisions are permissible in some states and impermissible in other states, our decision would invalidate many of those provisions, including provisions in other states of the Ninth Circuit.

I

There is no constitutional or federal statutory right to vote by absentee ballot. *See McDonald v. Bd. of Election Comm'rs of Chic.*, 394 U.S. 802, 807–08 (1969) ("It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots. . . . [T]he absentee statutes, which are designed to make

voting more available to some groups who cannot easily get to the polls, do not themselves deny . . . the exercise of the franchise . . . ."); *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring in the judgment) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required."); *Grifffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (rejecting the claim that there is "a blanket right of registered voters to vote by absentee ballot;" "it is obvious that a federal court is not going to decree weekend voting, multi-day voting, all-mail voting or Internet voting").

Arizona's restrictions on the collection and handling of absentee ballots are neutral provisions designed to ensure the integrity of the voting process. Although the majority claims that there is no evidence of "voter fraud caused by ballot collection," Maj. Op. at 2, (adopting *Feldman v. Ariz. Sec'y of State*, --- F.3d ---, 2016 WL 6427146 *24 (9th Cir. 2016) (Thomas, C.J., dissenting)), Arizona does not have to wait until it possesses such evidence before it acts. It may be pro-active, rather than reactionary. And the evidence for voter fraud in the handling of absentee ballots is well known. In 2005, the bi-partisan Commission on Federal

Election Reform[1] found: "Absentee ballots remain the largest source of potential voter fraud." *Comm'n on Fed. Elections Reform, Building Confidence in U.S. Elections* 46 (2005) [hereinafter *Building Confidence*]. As the Seventh Circuit so colorfully described it: "Voting fraud is a serious problem in the U.S. elections generally . . . and it is facilitated by absentee voting. . . . [A]bsentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin*, 385 F.3d at 1130–31; *see also Wrinn v. Dunleavy*, 440 A.2d 261, 270 (Conn. 1982) ("[T]here is considerable room for fraud in absentee voting and . . . a failure to comply with the regulatory provision governing absentee voting increases the opportunity for fraud." (citation omitted)); Adam Liptak, *Error and Fraud at Issue as Absentee Voting Rises*, N.Y. Times (Oct. 6, 2012), http://nyti.ms/QUbcrg (discussing a variety of problems in states).

The Commission on Federal Election Reform recommended that "States . . . should reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." *Building Confidence*, *supra*, at 46. It made a formal

[1] The Commission on Federal Election Reform was organized by American University's Center for Democracy and Election Management and supported by the Carnegie Corporation of New York, The Ford Foundation, the John S. and James L. Knight Foundation, and the Omidyar Network. It was co-chaired by former President Jimmy Carter and former Secretary of State James Baker.

recommendation:

> State and local jurisdictions should prohibit a person from handling absentee ballots other than the voter, an acknowledged family member, the U.S. Postal Service or other legitimate shipper, or election officials. The practice in some states of allowing candidates or party workers to pick up and deliver absentee ballots should be eliminated.

*Id.* at 47 (Recommendation 5.2.1). Arizona's restrictions hew closely to the Commission's recommendation. H.B. 2023 provides that "A person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony." Ariz. Rev. Stat. Ann. § 16-1005(H) (codifying H.B. 2023). Consistent with the Commission's recommendation, the law does not apply to three classes of persons: (1) "[a]n election official," (2) "a United States postal service worker or any other person who is allowed by law to transmit United States mail," and (3) "[a] family member, household member or caregiver of the voter." *Id.* § 16-1005(H)–(I)(1). I don't see how Arizona can be said to have violated constitutional or statutory norms when it follows bipartisan recommendations for election reform in an area well understood to be fraught with the risk of voter fraud. Nothing could be more damaging to confidence in our elections than fraud at the ballot box. *See* Liptak, *supra* (describing a study by a political scientist at MIT finding that election officials rejected 800,000 absentee ballots in the 2008 presidential election; "That suggests an overall failure rate of as much as 21

4

percent.").

## II

Moreover, the Arizona provision is substantially similar to the laws in effect in other states. In Indiana, for example, it is a felony for anyone to collect a voter's absentee ballot, with exceptions for members of the voter's household, the voter's designated attorney in fact, certain election officials, and mail carriers. Ind. Code § 3-14-2-16(4). Connecticut also restricts ballot collection, permitting only the voter, a designee of an ill or disabled voter, or the voter's immediate family members to mail or return an absentee ballot. Conn. Gen. Stat. § 9-140b(a). New Mexico likewise permits only the voter, a member of the voter's immediate family, or the voter's caregiver to mail or return an absentee ballot. N.M. Stat. Ann. § 1-6-10.1. At least seven other states (Georgia, Missouri, Nevada, North Carolina, Oklahoma, Ohio, and Texas) similarly restrict who can personally deliver an absentee ballot to a voting location. Ga. Code Ann. § 21-2-385(a) (limiting who may personally deliver an absentee ballot to designees of ill or disabled voters or family members); Mo. Rev. Stat. § 115.291(2) (restricting who can personally deliver an absentee ballot); Nev. Rev. Stat. § 293.330(4) (making it a felony for anyone other than the voter or the voter's family member to return an absentee ballot); N.C. Gen. Stat. § 163-231(b)(1) (allowing only family members or

guardians to personally deliver an absentee ballot); Okla. Stat. Tit. 26, § 14-108(C) (voter delivering a ballot must provide proof of identity); Ohio Rev. Code Ann. § 3509.05(A) (limiting who may personally deliver an absent voter's ballot); Tex. Elec. Code Ann. § 86.006(a) (permitting only the voter to personally deliver the ballot).[2]

Other states are somewhat less restrictive than Arizona because they permit a broader range of people to collect early ballots from voters but restrict how many ballots any one person can collect and return. Colorado forbids anyone from collecting more than ten ballots. Colo. Rev. Stat. § 1-7.5-107(4)(b); *cf.* Ga. Code Ann. § 21-2-385(b) (prohibiting any person from assisting more than ten physically disabled or illiterate electors in preparing their ballot). North Dakota prohibits anyone from collecting more than four ballots, N.D. Cent. Code § 16.1-07-08(1); New Jersey, N.J. Stat. Ann. § 19:63-4(a), and Minnesota, Minn. Stat. Ann. § 203B.08 sbd. 1, three; Arkansas, Ark. Code Ann. § 7-5-403, Nebraska,

---

[2] Moreover, at least two states had similar provisions on the books until recently. California formerly limited who could return mail ballots to the voter's family or those living in the same household. Cal. Elec. Code § 3017. It only amended its law earlier this year. 2016 Cal. Legis. Serv. Ch. 820. Illinois also used to make it a felony for anyone but the voter, his or her family, or certain licenced delivery companies to mail or deliver an absentee ballot. 10 Ill. Comp. Stat. 5/19-6 (1996); 10 Ill. Comp. Stat. 5/29-20(4). Illinois amended that provision in 2015 to let voters authorize others to mail or deliver their ballots. 10 Ill. Comp. Stat. 5/19-6 (2015).

Neb. Rev. Stat. § 32-943(2), and West Virginia, W. Va. Code § 3-3-5(k), two. South Dakota prohibits anyone from collecting more than one ballot without notifying "the person in charge of the election of all voters for whom he is a messenger." S.D. Codified Laws § 12-19-2.2.

Still other states have adopted slightly different restrictions on who may collect early ballots. California and Maine, for example, make it illegal to collect an absentee ballot for compensation. 2016 Cal. Legis. Serv. Ch. 820 (amending California Election Code § 3017 to enable anyone to collect an early ballot provided they receive no compensation); 21-A Me. Rev. Stat. Ann. § 791(2)(A) (making it a crime to receive compensation for collecting absentee ballots); *see also* Fla. Stat. § 104.0616(2) (making it a misdemeanor to receive compensation for collecting more than two vote-by-mail ballots); N.D. Cent. Code § 16.1-07-08(1) (prohibiting a person to receive compensation for acting as an agent for an elector); Tex. Elec. Code Ann. § 86.0052 (criminalizing compensation schemes based on the number of ballots collected for mailing).

Some of the laws are stated as a restriction on how the early voter may return a ballot. In those states, the voter risks having his vote disqualified. *See, e.g.*, *Wrinn v. Dunleavy*, 440 A.2d 261, 272 (Conn. 1982) (disqualifying ballots and ordering a new primary election when an unauthorized individual mailed

7

absentee ballots). In other states, as in Arizona, the statute penalizes the person collecting the ballot. *See* Ind. Code § 3-14-2-16 (making it a felony knowingly to receive a ballot from a voter); Nev. Rev. Stat. § 293.330(4) (making it a felony for unauthorized persons to return an absentee ballot); Tex. Elec. Code Ann. § 86.006 (making it a misdemeanor for an unauthorized person to possess between one and twenty ballots and a felony to possess more than twenty); *see also Murphy v. State*, 837 N.E.2d 591, 594–96 (Ind. Ct. App. 2005) (affirming a denial of a motion to dismiss a charge for unauthorized receipt of a ballot from an absentee voter); *People v. Deganutti*, 810 N.E.2d 191, 198 (Ill. App. Ct. 2004) (affirming conviction for absentee ballot violation); *see also* Ga. Code Ann. § 21-2-385(b) (providing for penalties up to ten years and a fine of $100,000 for anyone assisting more than ten physically disabled or illiterate electors). In those states, the ballot, even if collected improperly, may be valid. *See In re Election of Member of Rock Hill Bd. of Educ.*, 669 N.E.2d 1116, 1122–23 (Ohio 1996) (holding that a ballot will not be disqualified for technical error).

## III

"[T]he right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992). H.B. 2023 is well within the range of

8

regulations that other states have enacted.  I see no infirmity, constitutional or statutory, in Arizona's efforts to prevent the potential for fraud in the collection of early ballots.  I respectfully dissent.